Scott v. Scott.

---

SCOTT *et al.*, *Appellants*, v. SCOTT.

1. **Deed, Delivery of**: PRESUMPTION. Where a deed has been executed and acknowledged, the possession of it by the grantee is presumptive evidence of its delivery.

2. ———: ———. The lodgment of a deed properly executed and acknowledged by the grantor in a place to which the grantee has access, and from which he can without hindrance transfer it to his own possession, with the intent on the part of the grantor that the grantee may, after his death, take it and have it recorded does not constitute a delivery of the deed. (*Huey v. Huey*, 65 Mo. 689).

3. ———: ———. The evidence in this case reviewed and held that it was insufficient to show a delivery of the deed in controversy.

4. ———: ———. While marriage is a sufficient consideration to support a deed, yet delivery is as essential in such case as it is to other deeds.

*Appeal from Nodaway Circuit Court.*—HON. H. S. KELLEY, Judge.

REVERSED AND REMANDED.

*T. J. Johnston* for appellants.

(1) There was not sufficient evidence in the circumstances of this case to prove the delivery of the deed. Nor did the grantor, Maggie R. Scott, make it in the

Scott v. Scott.

form in which it now appears and in which it was recorded. Under ordinary circumstances, after proof of the execution of a deed, the delivery will be presumed from the possession of it by the grantee. 2 Greenl. Evid. [Redf. Ed.] sec. 297 ; *Yarnall's Adm'r v. Yarnall*, 6 Mo. 326–9. But such presumption may be rebutted by showing that such deed was not, in fact, delivered ; or that it was obtained surreptitiously by the grantee. *Huey v. Huey*, 65 Mo. 689 ; 2 Greenl. Evid. [Redf. Ed.] sec. 300. And the situation of the parties, the relationship existing between them, and the circumstances attending its execution may be such as to shift the burden of proof of delivery, and require the grantee in possession of the deed to show delivery to him, either actual or constructive. *Yarnall v. Yarnall*, 6 Mo. 329 ; *Garvin's Adm'r v. Williams*, 44 Mo. 465 ; 2 Pom. Eq., secs. 955–6, and note 1 ; *Street v. Gross*, 62 Mo. 226–8–9. The delivery of a deed may be made by the grantor saying and doing something, or by saying something and doing nothing ; or by doing something and saying nothing ; but in order to the transmission of the title there must be a delivery ; and, in the circumstances of this case, the burden of showing delivery of the deed of the twenty-third of April, 1883, devolved on the defendant. If the deed had, in fact, been delivered, it is very probable there would have been no trouble in showing it ; but where the circumstances of the whole transaction are suspicious, and out of the ordinary mode of transacting such business, it may be a matter of some difficulty to prove the delivery, but that fact should not relieve the party claiming under it of the burden. Upon the issue of delivery or no delivery, we say, that notwithstanding the presumption arising in favor of the delivery from the possession of the deed by the grantee, yet the record in this case furnishes abundant proof to overcome any such presumption. (a) It is very improbable that Maggie R. Scott, in her

right mind, would voluntarily give up to another a val-uable estate, worth perhaps twenty thousand dollars, upon the bare promise of support, without reservation or control, and without security for the performance. (b) If she actually made the deed and delivered it with the intention of vesting the title in the defendant abso-lutely, she would have known it, and known that she was no longer owner of it, and would have acted accord-ingly. (c) If the deed had been in fact delivered to defendant, for the purpose of vesting in him the title to the property, he would have known it and acted accord-ingly. This, upon the supposition that everything was fair and right, with no suspicious circumstances attend-ing it. (2) In whatever form the deed was executed by Maggie R. Scott, if executed by her at all, it was pro-cured by fraud and undue influence on the part of the defendant, exercised by him over her in consequence of the confidential relations existing between them.

*Edwards & Ellison* for respondent.

(1) As the case at bar is one in chancery, this court has the undoubted right to examine and pass upon the testimony anew. But where much of the evidence bearing upon the material issues was given orally in the trial court, as in this case, this court will defer greatly to the trial court as to the finding of the facts and will be extremely reluctant, where the evidence is conflicting, to disturb such finding. *Gimbell v. Pignero*, 62 Mo. 240; *Sharpe v. McPike*, 62 Mo. 300; *Boyle v. Jones*, 78 Mo. 403; *Hendricks v. Woods*, 79 Mo. 590; *Ford v. Phillips*, 83 Mo. 523; *Snell v. Harrison*, 83 Mo. 651; *Bank v. Murray*, 88 Mo. 38; *Chapman v. McIlwrath*, 77 Mo. 38; *Judy v. Bank*, 81 Mo. 404; *Bushong v. Taylor*, 82 Mo. 660. (2) The testimony is conclusive in this case that the consideration referred to in the deed of Maggie R. Scott to David A. Scott, dated April 23,

Scott v. Scott.

1883, to-wit, "That the said party of the first part (Maggie R. Scott), for and in consideration of the sum of being provided for during her natural life, as she desires, affection, and other very valuable considerations to her in hand paid by the said party of the second part (David A. Scott), the receipt whereof is hereby acknowledged," refers in no ambiguous terms to the contract of marriage then existing between them. Their long acquaintance with, attachment and affection for, each other; the letters of Maggie R. Scott of July 15 and 28, 1883; her repeatedly expressed wish and persistent purpose, uninfluenced by others, on her sick bed, to marry David A. Scott; the conceded fact, well and long understood by her brothers, that they would some time marry; the actual consummation of the agreement by their marriage, with all due solemnity, without secrecy, at the request of Maggie herself, in the presence of her brothers and many others, without objection, by a minister in high standing, establish beyond controversy, the meaning of that clause in the deed as interpreted by the parties themselves. This being so, the authorities supply a long list of decisions, both in this country and England, that the promise of marriage is the most favored and valuable consideration in the eye of the law to support a deed founded upon such promise, that the grantee in such deed is viewed in the light of a purchaser for value, and there is no instance in the books where his title has been disturbed after the marriage. *Lionberger v. Baker*, 88 Mo. 447; *Smith v. Allen*, 5 Allen [Mass.] 458; *Bunnell v. Witherow*, 29 Ind. 123; *Sterry v. Arden*, 1 Johns. Ch. 261; *Verplank v. Sterry*, 12 Johns. 536; *Rockafelow v. Newcomb*, 57 Ill. 186; 4 Kent [11 Ed.] 464, top p. 540; *Wood v. Jackson*, 8 Wend. 9-33; 2 Sugden on Vendors, 469; *Prewitt v. Wilson*, 103 U. S. 22; *Otis v. Spencer*, 102. Ill. 22, 30; *Gurwin v. Cromartie*, 11 Ired. [N. C.]; *Chandler v. Temple*, 4 Cush. 285; Kelley on Contracts of Married

Women, 25 ; *McCaw v. Burk*, 31 Ind. 56 ; *Douglass v. Waad*, 1 Ch. Cas. [Eng.] 99 ; *Brown v. Jones*, 1 Atk. [Eng. Ch.] 188 ; *Herring v. Wickham*, 29 Grat. [Va.] 628 ; *Anderson v. Green*, 7 J. J. Marsh. 448. (3) The deed in controversy was shown by the evidence of the attesting witness, W. E. Baird, to have been duly signed and acknowledged by Maggie R. Scott. The certificate is in proper form. The notary, Robert Baird, deposes that it was filled out when acknowledged and conveyed lands in Missouri. The envelope, identified by John Milone, postmaster at Urichsville, O., as stamped with the receiving stamp of his office at 8 o'clock a. m., April 26, 1883, was stamped with two three-cent postage stamps. He testified it came to his office from some other office in Ohio where it had been mailed. This envelope, as I. V. McMillan testified, enclosed the deed when the same was delivered to him September 17, 1883. The theory that this deed was acknowledged in blank, or that it was abstracted by David A. Scott from the trunk of Maggie R. Scott while she lay sick at the Luona hotel, is wholly unsupported by any evidence in the case, and is a mere figment of the imagination of counsel for appellants. This deed being found in the hands of the grantee, executed in due form, the clearest evidence would be required to overcome the presumption of its delivery, if there was no other evidence to show the delivery. *Reed v. Douthit*, 62 Ill. 348 ; *Brittain v. Work*, 14 N. W. Rep. (Neb.) 421 ; *Benson v. Wolverson*, 2 McCart. (15 N. J.) 158 ; *Simmons v. Simmons*, 78 Ala. 65 ; *Tunison v. Chamblin*, 88 Ill. 78 ; *Souverbye v. Arden*, 1 Johns. Ch. 239 ; *Chandler v. Temple*, 4 Cush. 285 ; *Cutts v. York Co.*, 18 Maine, 190 ; *Canning v. Pinkham*, 1 N. H. 353 ; *Ward v. Ross*, 1 Stewart's Rep. (Ala.) 136 ; *Ward v. Lewis*, 4 Pick. 518. (4) The charge in the petition that David A. Scott was the attorney and confidential adviser of Maggie R. Scott, and that she was under his power and influence, has no support in the evidence.

*W. W. Ramsey* also for respondent.

(1) The trial court found that the deed was legally executed and delivered, and in so finding it was supported by the law and the evidence. "The possession of a deed by the grantee or obligee, is, in the absence of opposing circumstances, *prima-facie* evidence of delivery." 2 Greenl. Evid. [7 Ed.] sec. 297; *Ward v. Lewis*, 4 Pick. 518; *Maynard v. Maynard*, 10 Mass. 456; *Berry v. Anderson*, 22 Ind. 36; *Dawson's Adm'r v. Hallett*, 2 Mich. 390; *Johnson v. Moore*, 28 Mich. 3; *Sawyer v. Warren*, 15 Barb. 282; *Whitaker v. Salsbury*, 15 Pick. 534; *Jackson v. Perkins*, 2 Wend. 308; *Henry County v. Bradshaw*, 20 Iowa, 355. When a deed, duly executed, is found in the hands of a grantee, there is a strong implication that it has been delivered, and only clear and convincing evidence can overcome the presumption. Otherwise titles could be easily defeated, and no one could be regarded as being secure in the ownership of land. *Tunison v. Chamblin*, 88 Ill. 378, *loc. cit.* 387. (2) The acknowledgment certified to by the notary, was *prima-facie* evidence that the deed was executed as recited in the certificate. *Wanneil v. Kem*, 37 Mo. 478; *Sharpe v. McPike*, 62 Mo. 300; *Brocking v. Stratt*, 17 Mo. App. 304. (3) The appellants having alleged fraud and forgery, the *onus* was upon them to establish such allegations, and not upon the respondent to disprove them. 1 Greenl. Evid. [9 Ed.] sec. 74; *Bank v. Baldenwick*, 45 Ill. 375; *Stewart v. Ashley*, 34 Mich. 183; *Danling v. Hurst*, 39 Mich. 765; *Parker v. Pierce*, 16 Iowa, 227. (4) The evidence fails wholly to support the charge that the deed was obtained by undue influence exerted by the defendant over Maggie R. Scott. (5) Marriage is not only a sufficient consideration for a deed, but it is the highest one known to the law. Kelly on

Contracts of Married Women, chap. 2, sec. 2; 4 Kent's Com. 464; *Marshall v. Morris*, 16 Ga. 368; *Magniac v. Thompson*, 7 Pet. 354; *Smith v. Allen*, 5 Allen [Mass.] 458; *Otis v. Spencer*, 102 Ill. 22, 30; *Stokes v. Jones*, 18 Ala. 734; *Wood v. Jackson*, 8 Wend. 9.

NORTON, C. J.—This is a proceeding in equity instituted in the circuit court of Nodaway county, to vacate and annul a certain deed purporting to have been executed on the twenty-third of April, 1883, by Maggie R. Scott, conveying to defendant certain lands in the counties of Nodaway and Vernon in this state, and other lands in the states of Ohio and Nebraska, and also all the personal property of said Maggie; which said deed was filed for record in the recorder's office in Nodaway county on the seventeenth day of September, 1883. On the trial of the cause the court rendered judgment for defendant, from which plaintiffs have appealed.

The grounds set up in the petition for vacating this deed are substantially as follows: First, that the deed was never delivered to defendant; second, that said Maggie R. Scott did not make the deed in the form in which it now appears and in which it was recorded; third, that in whatever form said deed was executed by said Maggie, if executed by her at all, it was procured to be executed, by fraud and undue influence on the part of defendant exerted· by him over her in consequence of confidential relations existing between them.

The deed sought to be vacated conveyed to defendant, "for and in consideration of the sum of being provided for during her natural life as she desires, affection, and other very valuable considerations to her in hand paid by the party of the second part, the receipt of which is acknowledged," all the real and personal estate of said Maggie. It is dated the twenty-third of April,

1883, and has appended to it a certificate of acknowledgment of the same date taken by Robert Baird, notary public, and is attested by said notary and W. E. Baird. It is admitted by the answer that all of the written part of said deed except the signatures of said Maggie, the notary, and W. E. Baird, is in the handwriting of defendant.

The evidence of the notary and attesting witness sufficiently prove the execution of the deed, and its acknowledgment before the notary. W. E. Baird testified that he was requested by said Maggie to witness the deed; that he never read it or heard it read, nor were the contents of the deed stated to him further than that it was a deed from Maggie R. Scott to David A. Scott; that he could not say whether the deed was filled out or not; that he did not look at it only when his signature was to be written; that said Maggie took the deed away with her.

Robert E. Baird, the notary, testified that he took the acknowledgment of this deed and also of another one a month or two previous; that one of these deeds was handed by said Maggie to Scott in the hall, and his impression was that it was the last one acknowledged. This deed, so far as the fact is disclosed by the evidence, from the time it was executed and acknowledged and handed by the notary to said Maggie, does not again appear till the seventeenth day of September, 1883, two days after the death of said Maggie, when it was given by defendant to one McMillan to be filed for record, and was by him on said day filed for record in the recorder's office of Nodaway county.

Mr. Noel, the recorder, testified that at the time the deed was filed his attention was called to it and he thought it was not all written at the same time; that there were at that time about three shades of ink, the ink in the descriptive part was lighter, the lower part of the description was lighter than the balance of it, newer

written; that the ink was more nearly alike when he testified than when it was filed for record.

Where a deed has been executed and acknowledged, the possession of it by the grantee is presumptive evidence of its delivery. *Yarnall v. Yarnall*, 6 Mo. 326. It is affirmed in the case of *Huey v. Huey*, 65 Mo. 689, that the lodgment of a deed properly executed and acknowledged by the grantor in a place to which the grantee has access, and from which he can without hindrance transfer it to his own possession, with the intent on the part of the grantor that the grantee may, after his death, take it and have it recorded, does not constitute delivery of the deed.

The first question to be considered is, do the facts in evidence overcome the presumption arising from defendant's possession of the deed, that it was delivered. As preliminary to the discussion of this question it is proper to state the relations the various parties sustained to each other.

It appears that Alexander F. Scott died in 1865 in Harrison county, Ohio, the owner of a large amount of real and other estate, leaving said Maggie R. Scott, his widow Eleanor, one of the plaintiffs, and the other plaintiffs in this suit, as his heirs; that defendant is the cousin of said Maggie, and commenced boarding in 1868 with the family of said Eleanor while going to school; that he assumed to act for said Eleanor as her agent in some matters pertaining to the estate of said Alexander, induced her to sell some of the lands and convey other lands to said Maggie; that he was authorized to sell certain lands in Vernon county, this state, at nine dollars per acre and was to receive one dollar per acre for making the sale, that he sold the land for $12.50 per acre, and accounted for it at nine dollars per acre and kept the balance. The evidence tended to show that Maggie was engaged to be married, in 1871 or 1872, to Rev. Workman, that this engagement was

broken off by the influence of defendant; that defendant's attentions to Maggie were displeasing to her mother, who some time thereafter, about 1876, refused longer to board him and ordered him away; that Maggie, in January, 1878, left her mother's and went to live with Samuel Scott, who lived twenty-five miles distant, and was her uncle and the father of defendant; that she returned to her mother's in the summer of 1881 and remained a week or two, returned again in the fall of 1881 and remained till May, 1882, and her last visit was in June, 1883. The evidence also tended to show that defendant acted as the agent of said Maggie in transacting her business, and in some instances as her attorney, and that he had full possession of her confidence.

The facts disclosed by the following evidence are relied upon to overcome the presumption raised by defendant's possession of the deed that it was delivered.

Lamon Scott testified as follows: "In May, 1883, after David A. returned from Ohio, I had a talk with him. Before this I had written a letter to Maggie about the partition of the land in Vernon county. I met David on the street in Maryville, and asked him what Maggie wanted to do about the division of the land in Vernon county, and he said he intended to let her do as she pleased, as my mother had blamed him for meddling, and he would have nothing to do with it, and he did not know what Maggie intended to do about it."

The letter of this witness was replied to on the fourteenth of May, 1883, by said Maggie, as follows: "Your letter of recent date at hand and contents noted. I think the remaining lands ought to be divided, but in which of the two ways I scarcely know. It may not cost so much for to settle up by each of us making quit-claim deeds to each other, but would it be quite as satisfactory a way of doing business as to partition it through court?"

The following letter of said Maggie written to defendant was also in evidence :

"E. Springfield, Jefferson Co., Ohio,
"July 15th, 1883.

"Dearest Cousin :—Your letter of the tenth containing P. O. order at hand. If you think I had better start west without having my dresses fixed, I suppose about next Tuesday or Wednesday (24 or 25), would be about as well as any time this month ; cannot at least hear from you and get ready earlier than this. If not at this time, I would prefer waiting until about the sixth of next month, as I do not care about traveling between the above mentioned times. *If we are to be married you may meet me*, if not, I would just as leave go alone. Can't you make it suit to meet me in St. Louis ? Write me full instructions—what time to leave here, and what train to take ; and if you are to meet me, I would rather you would be at the place named in advance of me, as I do not want to wait. Shall I pack my box and have it taken to the station when I go, and shipped as freight, and what shall I do with Nellie's squirrel ? I have never got any cage for her. Please answer me fully everything I ask you. * * * Hoping to hear from you right away, I will close.

"As ever,          M.

"Be sure and write me full instructions."

Another letter of hers, dated twenty-eighth of July, 1883, was also read in evidence, so much of which as bears upon the questions involved is as follows : "Your letter of the twenty-fifth containing instructions came to hand last evening. I have nothing of importance to write you. I am afraid I will not have money enough ; do not think I will have my box shipped, as I want to have some money over and above what gets my ticket, but will pack it and have it ready to go at any future time. If nothing happens to hinder me will start on the sixth of August. * * * I suppose another week will finish up our writing to each other."

Scott v. Scott.

William Scott testified, that, "in August, 1883, Dave and I went to Vernon county to partition the lands there. Dave told me Maggie would be there and I could see her about it. On the road to Vernon county, he told me he and Maggie were going to be married.  *  *  *  I never heard Maggie say anything about their getting married while down there. The reason why they did not get married was because her trunk was lost and all her clothes were in it. Trunk went on to Fort Scott."

The deposition of D. H. Edwards is as follows : "In August last (1883) David A. Scott and his cousin came to my house, in Nevada, Missouri. David had been to my house several years ago. David Scott said when he came to my house, last August, that he was there to look after lands of A. F. Scott's estate ; that he was the agent and attorney of his cousin Maggie, and he expected she would be here in a short time. Within a day or two he brought a young lady to my house from the train, and introduced her to me as his cousin, Miss Scott. They staid at my house several days and went to the country to look at the lands. They went to Ball Town to look at the lands there, and, after their return, he said they went to look at the land that she might choose the part that she would take in the division of the lands."

Thirza Edwards testified for plaintiffs by deposition : " David Scott came to Nevada, Missouri, with his cousin last August (1883); that, within a day or two after David came, he brought a young lady to the house from the train, whom he introduced as his cousin, Miss Scott, and as the sister of the other young man named William B. Scott. David said, while here, that he was acting as the agent and attorney of his cousin Maggie ; that they were here to look over the land in which Maggie had an interest coming from her father's estate, with a view of dividing it and for her to make a selection of her part. Miss Maggie told me that she was here to look after her

land ; and after she came back from Ball Town she said she had been to look at the land over there to see what part of the land she would take as hers. She called it her own land.''

Mary Scott testified as follows : "Know David A. Scott and knew Maggie R. Scott ; Maggie came to Nodaway county in August, 1883 ; I met her then and was with her about two weeks ; I heard her speak of her lands several times during the week ; I heard David Scott, the defendant, ask her how she liked the country ; I did not hear her reply. David said to her, ' You had better build you a house on your land and make up your mind to stay here.' This conversation was at Lawson Scott's house about a week before the Nodaway county fair, which was held the last days in August and first days in September, one week ; I believe she came away from there on Wednesday during the fair. David Scott came then and took her away in a buggy.''

It appears that said Maggie was taken from the fair to the Luona hotel, in Maryville, where defendant boarded, and that while there, during the sickness of which she died in about two weeks, she said to Anna Shepherd that "she came to marry Mr. Scott, but her folks objected and she was in trouble ; * * * that she had come out to marry Dave, and her folks objected and she was worried,'' and that was the only talk she had with her. It further appears that, on the night of the tenth or eleventh of September, the life of said Maggie was despaired of ; that she asked the doctors what her chances were and they told her no chance, and she said, then, "if no chance, I want to marry Dave this night.'' It appears on that night, about the time she became aware of her condition, she spoke in the presence of defendant of the manner in which she wished to dispose of her property.

Salina Terry, who had been called in as a nurse for said Maggie on the third or fourth of September and

Scott v. Scott.

remained till she died on Saturday, the fifteenth day of September, testified that, "when first called Maggie wanted some underclothing; that they were in her trunk; her trunk had not been opened and she wanted us to bring her some; her trunk was taken to David Scott's room and remained there till after she died. I spoke about getting some clothing and asked that her cousin go with me and open her trunk to get it. She objected and we went out and brought her some. * * * I was there when they sent for Elder Gerhart; it was thought she was dying and I sent a boy for Gerhart; she was at times out of her head, and we had to hold her in bed; she said she wanted a minister and I sent for Gerhart; he came and some one said, 'here is the minister,' he stepped up and shook hands; at intervals she would be rational and then seemed to be irrational; Mrs. Smartwood, Drs. Moore and Nash, Mrs. Woodward, and her friends were there; I was not in the room when the conversation about the marriage came up; but when I came in Mrs. Smartwood said to Maggie: 'If I wanted to marry Dave I'd do so.' When Hatch came she was just in the condition she had been, rational and irrational at spells; we thought she was dying; the doctors said she could not live; the parties then said she ought to be told her condition; I then spoke to the doctors and they told her they could do nothing more for her; this was just before I sent for Gerhart; I heard her say to Gerhart that she wanted to be married, and he asked her if he thought she was in a fit condition, and refused to marry them. I was out when the ceremony took place and when I came back she was just raving very much worse than I had ever seen her; she was just terrible, was wild, and we had all we could do to take care of her. David A. Scott was there in and out. The next day she was moved; she was not conscious; she was very low; never said a word about Dave. The next night after the marriage she asked Dr. Nash if she would

recover ; he said not ; she said she came here to do business and had done nothing. The last three or four days I think she uttered but few rational words. David Scott came after me to wait on her ; Dave was there nearly all the time, and we could not talk with her without him coming in ; he staid in his room close by. The trunk was taken to Dave's room in about a week after I went there ; I was not present when the trunk was opened ; I did not know whether she directed her trunk to be opened ; I saw it after it was in Dave's room open ; I saw it every day and its contents were lying on the floor ; papers and letters were scattered about ; saw it that way every day. The night of her marriage she spoke about her property ; David A. Scott was there ; she said she wanted to dispose of her property ; she wanted to donate a part of it to some charitable institutions ; she told Dave Scott she would give him two thousand dollars ; she said, 'Is that not enough?' and Dave said, 'Oh never mind me.' She then said to him, 'Aint nine hundred dollars enough?' She wanted to give her uncle Samuel Scott four thousand dollars, and said something about her clothing."

The evidence of this witness, as to what was said concerning the disposition of her property in defendant's presence, is corroborated by that of five other witnesses, one of whom, Mrs. Smartwood, testified that she spoke of disposing of her property ; wanted Dave to have two thousand dollars, her uncle four thousand dollars, his mother six hundred dollars, and the remainder divided among her brothers and sisters. When she mentioned Dave, he spoke up and said, "Never mind me, I am well enough off."

William Scott testified, "that on the night of the eleventh of September, Maggie asked Dr. Moore what her chances were ; he said they were against her ; she said, 'I reckon then I must die.' She soon after spoke of her property and said she wanted to leave Sam Scott

four thousand dollars and David Scott two thousand dollars, and David said, 'Never mind me.' Maggie on that night said she wanted a minister ; wanted to get married. Rev. Gerhart came and stood by her, and when she was talking to him she seemed all right. She spoke to David and said, 'Are you going to fulfill your promise?' I did not hear what he said, but he went out and got a license ; he was gone about a half hour. Rev. Gerhart told her not to think of such a thing. I did not hear her say she would get some one else. Rev. Hatch came. She seemed calmer and he went through the ceremony. David A. stood up and held her hand in his. She repeated after him. She said, 'Doctor, do you think I am really married?' and then some one said that is the minister, and then she said the same to him, and he said to her, 'Yes, you are really married.' When she was talking she seemed rational ; she was flighty just all the time. The next day she seemed better and all had hopes that she would recover, but she got worse." The evidence of David Lawson Scott is to the same effect as the above.

Rev. Gerhart testified that he was called to see Maggie about midnight ; that she was very sick and he thought she was dying. "She asked the doctor how long he thought she would live and then said she wanted to be married, but not in these words, but in disconnected sentences, but so that I understood her. I told her I should not think of such a thing—she was hinting all the time about being married. It is hard to say what she said, just like a person who has an indefinite idea about something. I repeated several times that I would not think of such a thing as getting married. When she would utter a word, others put in and no sentence was completed, so I could not get it. David was one who would put in, and say, 'be quiet and all would be right ;' he said that several times. I was there about an hour ; I considered her irrational and beside herself ; I did not marry them."

Wm. A. Hatch testified as follows: "I am a minister of the gospel, and was called upon to perform the marriage ceremony between David A. and Maggie Scott, on the eleventh or twelfth day of September, 1883; I do not know whether just before or after midnight. The parties were at the Luona hotel. There were at least two present besides the contracting parties, and there may have been others. I asked the woman if she desired to be married, she said she did, and Mr. Scott requested me to make the ceremony as short as possible, and I cut it as short as I could according to the form of our church. I said, 'If there is any objection to the persons being joined in the holy bonds of wedlock, now is the time to make it known.' I then had them join hands. I then asked Mr. Scott if he took this woman to be his lawful wife; he answered yes. She answered the same way to the same question, and they both understood it; I asked her if she understood it, she said yes; had to speak a little loud, as her hearing was somewhat impaired; no ring was exchanged; I did not require her to repeat all the ceremony; she was too weak; but I repeated to her and asked her if she understood, and she said she did. But David repeated; I asked no questions, but looked to see the papers were all right; David Scott had the license, and it was all right; I asked the doctors before commencing the ceremony if she was capable of understanding it, and contracting marriage, and they said she was; my impression was that her mind was sound, but not in possession of all her faculties; when the ceremony was through, she asked me if she was really married, and when I answered her she was, she seemed very happy; I remained in the room but a moment after the ceremony; I was not back to see her again before she died; I studied medicine and was a practicing physician when I entered the ministry; I was in another room five or ten minutes before the ceremony was performed, and was not in the sick room until the

ceremony; she repeated some of the words, but did not repeat all; I asked all persons present whether there were any objections to the marriage; David A. was standing by the bed, or leaning on it; David A. came for me near midnight; do not know whether just after or just before; she was buried on the sixteenth; on the night of the marriage, the doctors told me they did not think she would live through the night; she was very low; I was in the room from five to ten minutes; she was fully awake when I first spoke to her; her hearing was impaired."

Mrs. Smartwood testified that she was present the night of the marriage. "Hatch came in and asked Maggie if she realized what she was doing, and she said she did; I think she was in her right mind at the time, as sensible as any woman; she spoke about giving her money away; after the marriage she seemed better the balance of the night and better for two days; she was out of her head a good deal while asleep, but when I would wake her up she would know everything; on being told by her doctors that there was no chance, she said, 'if no chance I want to marry Dave that night.' I unpacked her trunk, and got her clothes; Dave came in next morning and asked her if she realized that she was married, and she said yes, and he asked her if she realized that he was her husband, and she said yes, and seemed to know him as well as anybody. * * * I went to her trunk to get her clothes and packed it and put it in shape twice; it was in a small bedroom; I found once after she was dead, on Monday or Tuesday, her trunk open and things scattered; I repacked it; do not know when it was opened."

Mrs. Woodworth testified to the same effect as to the condition of Maggie's mind as the above.

Dr. Nash, attending physician, testified: "I was present in the room when Maggie was married, could hear the minister but could not hear what she said; I

was in but a few minutes before the marriage; she had been roused up out of sleep and I thought she was rational; she was taken sick about first of September, 1883 ; was sick with typhoid fever, a very severe case ; she became flighty and grew worse, not more ·so than usual ; she kept getting worse till the tenth, and Dr. Moore was requested to call in ; she began to have alarming symptoms five or six days before the marriage ; delirious at times, but not so much as I have seen cases ; she never got better, but grew worse and worse ; there were times when she was free from fever ; but at times the fever was higher and then she was delirious."

It was shown by the deposition of John Milone, who was postmaster at Urichsville, Tuscarawas county, Ohio, that he kept a receiving stamp with which he stamped the date, when letters coming in the mail to his office were received ; that a large envelope directed to "David A. Scott, Urichsville, Tuscarawas county, Ohio," was stamped with said receiving stamp on the opposite side as received, "April 26, 8 o'clock, a. m.," and that his impression was said envelope was mailed somewhere in Ohio. It is also shown by the evidence of McMillan, to whom defendant, on the seventeenth of September, 1883, gave the deed in question to be filed for record, that it was in this envelope and that the address on it to "David A. Scott, Urichsville, Tuscarawas county, Ohio," was in said Scott's handwriting.

It has been said by an eminent chancellor, "Tell me what the parties have done under a deed, and I will tell you what that deed means," and in *Patterson v. Camden*, 25 Mo. 22, it is said : "I know of no better mode of ascertaining the meaning of a writing than is shown if all the parties acted on a particular meaning." So it may be said that this principle equally applies in the consideration of the question whether or not a deed has been delivered. The legal effect of the deed in question, if, after its execution and acknowledgment, it was delivered

to defendant, was to pass to him the full title of Maggie Scott to the property conveyed, which according to the evidence was all the property, real and personal, which she owned or possessed. After its delivery, the said Maggie owned nothing, and defendant became the owner of all her real and personal estate.

The action of said Maggie, as well as the action of defendant, after the deed was executed and acknowledged, cannot be reconciled with the fact that this deed was delivered. As late as August, after its execution, the land in Vernon county, which it purported to convey, was spoken of, both by said Maggie and defendant, as the land of said Maggie, and after she left said county and went to Nodaway county, defendant said to her, that "you had better build a house on your land and stay here," when if this deed had been delivered to him, he knew as a lawyer, that she did not own a foot of land, nor a single dollar with which to build a house. If this deed had been delivered before she came to Vernon county, defendant knew that he alone was the owner of said Maggie's undivided interest in the land in said county belonging to the heirs of Alexander Scott, deceased, and yet he said he was there as her agent and attorney to look after these lands, and went with her to see them in order that she might choose what part of it she would take as hers. So in May, 1883, when, after his return from Ohio, he was asked what Maggie would do with reference to the division of the land in Vernon county, it would have been natural for him to have said, if the deed in question had then been delivered, I own these lands and not Maggie, but instead he said, he did not know what she would do about it, and that he did not intend to meddle with it, but let her do as she pleased. Coming on down to a later period, to the night of the eleventh or twelfth of September, 1883, when she was upon her deathbed, and informed that nothing more could be done for her, and impressed with the belief

that she must die, and that the crisis was then pending, and in view of approaching dissolution, she said in defendant's presence that she wished to dispose of her property and gave directions as to the way in which she wished it disposed of, saying at one time she wished defendant to have two thousand dollars, and asked him if that was enough, and at another if nine hundred dollars would not be enough, to which he replied never mind him.

If, anterior to this time, she had delivered this deed to defendant, she must have known it, and have known that it conveyed to him everything, real and personal, that she had, and it is incredible to suppose, that, in this extreme moment, she would undertake, if said deed had been delivered, to dispose of the property it conveyed and designate the persons to receive it after her death, an event which she, as well as those around her, believed was then about to take place. The evidence shows her to have been an intelligent, accomplished woman, and the fact is established beyond cavil or dispute ; that she undertook to direct the disposition of many thousands of dollars worth of property as her own, in view of approaching death, is wholly irreconcilable and inconsistent with the fact that she had delivered the deed in question to defendant conveying to him everything that she owned or possessed.

The evidence relied upon by defendant to show delivery of the deed at the time it was executed and acknowledged is not satisfactory. One of the attestants testified that, after its acknowledgment, said Maggie took the deed with her when she went away. The notary testified that he had taken her acknowledgment to two deeds, and had an impression that one of them, the last one acknowledged, was handed to defendant in the hall of the house after it was acknowledged. The theory that the deed was then delivered is inconsistent with, and contradictory of, the other theory, which

defendant sought to establish by the evidence, viz., that the deed after its acknowledgment was sent to him through the mail enclosed in an envelope directed to him at Uhrichsville, Tuscarawas county, Ohio, and received at the said postoffice on the twenty-sixth of April, 1883. From this fact, and the further fact that, on the seventeenth of September, 1883, defendant handed the above envelope with the deed in question in it to McMillan to be filed for record, we are asked, in the absence of all evidence to that effect, to infer that the deed was enclosed in this envelope when it was taken out of the postoffice to which it had been sent. Such an inference is too far-fetched and unwarranted, when the other fact is considered that the address on this envelope was in the handwriting of defendant. If, when it was addressed, the deed was in it, the necessity of addressing it to himself to be delivered at another place and time, when he must then have had it in possession, cannot be perceived, and the evidence fails to show any such necessity.

The authorities cited by counsel abundantly establish the proposition that marriage is such a valuable consideration as will support a deed, and we have so held in the case of *Lionberger v. Baker*, 88 Mo. 447. But a deed, if made on such consideration, before it can be operative as such, must, like all other deeds, be delivered, and after a careful examination of the evidence we have reached the conclusion that the deed in question was never delivered, and for that, if for no other reason, plaintiffs are entitled to the relief sought in their bill. If a contract of marriage, which the evidence tends to establish, existed between said Maggie and the defendant, the evidence fails to show any willingness or effort on defendant's part to fulfill it till the night of the eleventh or twelfth of September, 1883, when the life of said Maggie was

despaired of, and she, as well as her physicians, attendants, and friends, had abandoned all hope of her, and when the probability was apparent to all, that the matrimonial bonds, if then assumed, would be dissolved and broken before the rising of another sun, and which were in fact dissolved by her death between four and five days.

There is abundant evidence in the record to show that defendant acted as the agent and adviser of said Maggie, and in some instances as her attorney, and that he had possession of her confidence ; but in the view we have taken of the case it is unnecessary to discuss the point made by plaintiffs' counsel, that the deed, if executed, acknowledged, and delivered, was procured to be executed by the undue influence of defendant over said Maggie growing out of such confidential relations.

The judgment will be reversed and cause remanded with directions to the circuit court to enter a decree in conformity with this opinion.   All concur, except Ray, J., absent.