WILLIAMS et al., Appellants, v. CHICAGO, SANTA FE AND CALIFORNIA RAILWAY COMPANY, et al.

153   487
157    40

153   487
89a  311

153   487
166  257

153   487
92a  ³673
93a¹²233

153   487
94a  ¹267
c94a  ²268

153   487
f95a  ¹608
97a  ²  37
100a¹²  87

Division Two, January 23, 1900.

1. **Reference: COMPULSORY.** The long and intricate account in this case made it one for compulsory reference.

2. ——: ——: **REVIEW.** Where the case is one for compulsory reference, although the case has by agreement been submitted to a referee, the trial court may on motion of either party review the findings of the referee, and the appellate court may review the findings and reverse the judgment of the circuit court.

3. **Work Performed: VALUE: DETERMINABLE BY THIRD PARTY.** Where it has been agreed between a railroad company and a contractor that the value of all extra grading and work to be done and materials to be furnished in the making of a roadbed, shall be determined by the chief engineer of the company, and his findings shall be final, the contractor can not claim a greater amount than the engineer has fixed, although the work be really worth more, unless it be shown that the engineer fraudulently estimated the value thereof, or fraudulently or collusively neglected and refused to make any estimate.

4. ——: ——: **CONTRACT: ENGINEERS AS ARBITERS: FRAUD: APPELLATE PRACTICE.** Where a contract for the construction of a roadbed gives the engineer of the company authority to determine what the material removed is, this court will not weigh evidence as to the character of the material unless the engineers misconstrued the contract or acted fraudulently.

5. ——: **USE OF DIFFERENT MACHINERY.** Where the use of graders and wheelbarrows in the construction of a railroad roadbed is forbidden by the engineers, and their use is properly referable to them under the contract between the contractor and the company, and their decision is by the contract binding and final, in the absence of fraud or such gross error as to raise the necessary implication of fraud, the contractor can not recover for the cost of scrapers purchased to complete the work.

6. **Presumption: CONFLICT BETWEEN REFEREE AND JUDGE.** Where there is a conflict between the finding of the referee and that of the circuit judge, the presumption on appeal is in favor of the correctness of the judicial action of the court, and it is only when it has abused its discretion in rejecting the referee's finding that the appellate court will interfere.

7. ———: GRUBBING: "CLOSE CHOPPING." Where the contract for the construction of a railroad roadbed provided that, in the absence of fraud and collusion, the engineer's estimates of the amount and value of extra work shall be final, and the contract stated the price for grubbing and ordinary clearing, but said nothing about "close chopping," and the engineers found that there were so many acres of "close chopping," and settled with the contractors for the number of acres found by them, and the contractors in their subsequent demand for increased estimates made no claim for a larger number of acres, it will be held, in a suit by them for "close chopping" on the extra number of acres, that they can not recover.

8. ———: WAIVER. Where contractors have twice in writing and once orally fully acquiesced in the engineers' classification of the work done by them, the classification being by contract left in the first place to the engineers, they will not be permitted to reject that classification years after the work has been completed.

9. Waiver: DEFINITION. Waiver is where one in possession of any right, whether conferred by law or by contract, and of full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intenton to rely upon it.

10. Classification: HARDPAN: ARBITRATION: WAIVER. Where the contractors have been invited to file in detail all their grievances with the engineer who has been chosen to arbitrate all difference as to the classification of the material removed, and in writing they state "the classification is entirely satisfactory," over a certain section of the roadbed, and settlement has been made with them on that basis, they will not afterwards be heard to demand a new classification.

11. ———: ———: LOOSE ROCK: WAIVER: EXCUSE. It is held in this case that the engineer did not fail to classify certain material which it is now claimed was "hardpan," but on the contrary did classify it as "loose rock," etc., and that under the contract they were empowered as arbiters to make such classification, and that the contractors waived any objection thereto, although they now allege that their reason for keeping silent at the time they should have objected was that it would have irritated the engineers.

12. ———: AMBIGUOUS CONTRACTS: CONSTRUCTION BY PARTIES. In the construction of ambiguous contracts the court will look not merely to the words employed, but the subject-matter, the surrounding circumstances, and the contemporaneous interpretation thereof by the parties themselves.

13. ————: ————: ————: PLOW TEST.  Under the interpretation the parties put upon their contract in this case, it is held that they agreed that a six-horse plow test should be applied to the material to determine whether it was loose earth or loose rock. and that agreement forestalls any determination of whether or not the material was in fact hardpan.

14. Judgment: TENDER OF GREATER SUM: COSTS.  Where plaintiff is entitled to a mechanic's lien if he is entitled to any judgment at all, an offer by defendant to permit a mere money judgment to go against him, will not authorize a judgment against plaintiff for costs.

15. ————: INTEREST.  Where plaintiff has been driven into court to establish his mechanic's lien, he is entitled to lawful interest from the date of demand, and if no formal demand had been made then from the commencement of the action.

Appeal from Macon Circuit Court.—*Hon. Andrew Ellison,* Judge.

REVERSED (*with directions*).

*J. E. McKeighan* and *George A. Mahan* for appellants.

*E. D. Kenna, Gardiner Lathrop, Ben Eli Guthrie* and *Samuel W. Moore* for respondents.

GANTT, P. J.—This is an appeal by plaintiffs from the judgment of the circuit court of Macon county.   This is the second appeal in this cause.   The first is reported in 112 Mo. 463.

The  action grows out of a contract to construct the roadbed and prepare the same for the superstructure upon that portion of defendant's road described as sections 75 to 94 inclusive, in division 2, and sections 95 to 114 inclusive, in division 3, commencing about three miles west of Grand river, in Carroll county, and terminating at the east end of section 114 in Macon county.

The right of lien was settled on the former appeal.

After the reversal of the former judgment, the plaintiffs amended their petition at the April term, 1893, of the Macon

circuit court. After setting out the contract in full, together with the specifications, plaintiffs allege that between the 7th day of February, 1887, and the 19th day of January, 1888, on which last day the last work was done and materials furnished, plaintiffs did and performed all the work and labor and furnished all the materials required of them by the terms of said contract, and also furnished materials and did extra work under the terms of said contract in section 115 in division four of said railway in the counties of Chariton, Linn and Macon, amounting in all to the sum of $679,206.68, setting out the various items in detail, and admitted payments and credits to the amount of $490,894.94. There were also allegations as to the rights and liabilities of the other defendants, and the filing and recording of the lien.

Plaintiffs then proceeded to assign as breaches of this contract that defendants' engineers fraudulently and willfully misconstrued the contract and did not classify and measure said work from time to time as required by the contract, but made only approximated or percentage estimates, calculations and measurements, with intent to defraud plaintiffs out of their just rights and benefit the railroad company. It is then specified under nine different specifications wherein the measurements and estimates were fraudulent. Plaintiffs further averred that the engineers of defendants did not at the completion of the work certify as required by the contract the completion of the work and labor, and the furnishing of said material, although often requested, and although a reasonable time had elapsed after the completion of the work before the commencement of this suit, but fraudulently neglected to do so in order to defeat plaintiffs' right to the lien conferred by law for the balance due them.

The defendants' answer consisted first, of a general denial; and then proceeded as follows:

"2. Defendants further answering say that during the progress of construction by plaintiffs of that part of defend-

ants' railroad covered by their contract, they were furnished from month to month with estimates by the defendants' chief engineer and his assistants, showing the quantities and amounts of the several kinds of work done by the said plaintiffs under their said contract, and that they were fully acquainted with the basis upon which said estimates were made and the methods by which the results therein contained and set forth were arrived at; that with such knowledge the said plaintiffs acquiesced in said estimates and submitted to the same and expressed their satisfaction therewith as to all that part of the work covered by their contract comprehended in division two thereof, extending from section seventy-five to section ninety-four, both inclusive; that upon the completion of plaintiffs' said work under their contract defendants' chief engineer and his assistants made final estimates of the plaintiffs' work upon said division two embracing the aggregate of all of said monthly estimates and more: that by reason of the premises, plaintiffs waived all right to complain of the quantities and amounts of the several kinds of work allowed to them on said division two in said final estimates, and ought not to be heard to claim or permitted to recover any different or additional amounts than as shown therein, and are estopped so to do.

"3.   Defendants further answering say that upon the completion by plaintiffs of the work done by them under their contract, and before the making and return of the final estimates by defendants' chief engineer and his assistants, as provided by said contract, defendants' said chief engineer, after an oral interview with plaintiffs, in which they complained of the estimates which had been made, requested them to submit to him in writing a full statement of their claim for increased allowances, for consideration by him in making up the final estimates; that, thereafter, in compliance with said request, on the 24th day of December, 1887, and on the 26th day of January, 1888, plaintiffs submitted the following statements of all of their claims for increased allowances of

loose and solid rock and of haul:" [Here follows the item-
ized claim of plaintiffs for increased allowances on the various
stations of their work and objections to and complaints against
the classification of material handled by plaintiffs, followed by
the following allegation:]

"That said defendants' chief engineer received said state-
ments and duly considered the same in making up said final
estimates, and gave plaintiffs certain additional allowances on
account thereof, as shown therein; that plaintiffs thereby
waived all claim to any additional allowances upon their work
except as shown in said statements, and ought not now to be
heard to assert any other or different claim, or to be permitted
to recover for any alleged insufficient estimates upon any
other portion of their said work, and are estopped so to do.
And defendants also say that their chief engineer having
passed in good faith upon the claims of plaintiffs, as exhibited
in said statements, and having included in the final estimates
the results of his judgment thereon, they are estopped to claim
or recover any other or greater sum than as shown by said,
estimates.

"4. Defendants further answering say that after the
completion by plaintiffs of the work done by them under their
contract, and after the submission of their written claims for
increased allowances, they were informed by defendants' chief
engineer that the monthly estimates for the month of Febru-
ary, 1888, then soon to be returned would be substantially the
same as the final estimates; that said February estimates were
soon afterwards returned and were substantially the same as
the final estimates, being in many cases identical, and in others
the final showing increased allowances in favor of
plaintiffs; that plaintiffs with full knowledge of the
character and contents of said February estimates
accepted the same and received and receipted for the
money due them thereunder; and thereby waived all right to

complain thereof, or of the said final estimates, which were afterwards returned and are substantially the same as the February estimates, and are estopped to claim any other or additional sum than as shown to be due them by and under said final estimates.

"Wherefore, defendants pray judgment that they be hence dismissed with their costs."

Plaintiffs' reply denied each and every allegation of new matter contained in the answer. At the September term, 1893, "by agreement of counsel of respective parties in open court the above cause was referred to F. L. Scofield, Esq., of the Hannibal bar, to hear, try and determine all the issues in said cause and report to the court with all convenient speed."

The hearing before the referee began on February 14, 1894, and occupied seventy-five days in all. The arguments of counsel before the referee consumed three weeks. On September 11, 1895, the referee filed his report together with the testimony, exhibits, etc. In due time both parties filed exceptions to the referee's findings and conclusions.

The circuit court in a written memorandum passed upon the exceptions and sustained the findings of the referee in many respects and rejected those which increased the findings beyond the estimates of the engineers, and gave judgment for the amounts found due on the final estimates and adjudged costs against plaintiffs.

Plaintiffs appeal.


I.


The parties to this litigation can congratulate themselves that their respective claims have been presented at every stage of the case with signal ability and the most painstaking care. The report of the referee indicates the most commendable industry and is stamped throughout with absolute impar-

tiality and a thorough appreciation of the questions of law presented by counsel.

The thoroughness with which counsel have discussed the various points of difference and the systematic treatment thereof by the referee have greatly simplified and lightened what would otherwise have proven an interminable task.

The record contains nearly fourteen thousand pages, but the abstracts of the record and the admirable statements and briefs of counsel have abridged this great mass, and still the differences are so pronounced that we have been compelled to review the testimony at each stage in our endeavor to arrive at a just conclusion.

A somewhat general statement will conduce to a better apprehension of the particular points involved in this appeal.

In the year 1886 the Atchison, Topeka and Santa Fe Railroad Company began to put into execution its plans to extend its railroad from Kansas City, Missouri, to Chicago, Illinois. A. A. Robinson was at that time the second vice-president, general manager and chief engineer of said company. As a preliminary step he employed Mr. Bernard F. Booker as chief engineer for the location of said proposed extension. Under Mr. Booker were other engineers in various capacities, notably John A. Fulton, E. M. LeProhon, George C. Earle and J. H. Snow.

It appears that one of the plaintiffs, Mr. Benezette Williams, had been a college class-mate of Mr. Robinson, the general manager; and in December, 1886, applied to him to obtain a contract in the construction of the said railroad. Sometime in December, 1886, or January, 1887, the line had been determined, and approximated estimates made, and contractors invited to bid and blank contracts with specifications were submitted to them in Kansas City, Missouri. The bidders met at Booker's office, where the profiles, preliminary estimates and blank contracts were open to inspection. Mr. Benezette Williams and Mr. John Nichol, two of the plaintiffs, were present.

The evidence tends to show that during these interviews Mr. Robinson and Mr. Booker informed the bidders that the locations were as yet not finally settled, but were subject to changes. That the crossings on other railroads would probably be changed to overhead or under crossings, and that there might be an overhead crossing over the Council Bluffs branch of the Wabash railroad in the Grand river bottom. Contractors were also advised that much hard clay would be encountered. The plaintiffs testified, however, that they did not hear any of these statements.

For the purpose of keeping their accounts during construction, the line was divided into sections and divisions and the work on each separately estimated.

The reference in this case was by consent of both parties duly entered of record, but it was referable without the consent of either. The long and intricate account rendered it peculiarly proper for a reference. In a word, it was a case for a compulsory reference. In such cases it is the settled law of this court that the circuit court may on the motion of either party review the findings of the referee on the evidence reported and make its own findings and this court on appeal may review the findings and affirm or reverse the judgment of the circuit court in whole or in part. [R. S. 1889, sec. 2138; State ex rel. v. Hurlstone, 92 Mo. loc. cit. 333; Wentzville Tobacco Co. v. Walker, 123 Mo. 671; Caruth-Byrnes Hardware Co. v. Wolter, 91 Mo. 484.] On this point of practice both parties are agreed.

The referee made eighteen distinct findings on the evidence. Of these twelve were in favor of the defendants, all of which were approved by the circuit court. Briefly stated he found:

First. That the charges of fraud made by plaintiffs against the engineers as to their classification of materials and their measurements of excavations, were wholly unsustained.

Second. That the charge in the petition that the en-

gineers did not certify in writing the completion of the work, but fraudulently refused to certify the same in order to injure plaintiffs and deprive them of their lien, was not sustained, but that the monthly estimates made and certified during the progress of the work and the final estimates made and certified by the engineers, were a substantial compliance with that provision of the contract.

Third. That the final estimates were returned by the engineers in a reasonable time and no injury whatever resulted to plaintiffs from the failure to file the same sooner than they were filed.

Fourth. That the fact that the final estimates consisted of two parts instead of one final estimate constituted no valid objection thereto.

Fifth. That the change of the line at Grand river gave plaintiffs no cause of action because it fell strictly within the terms of the contract.

Sixth. That the claim for damages caused by the change of grade at the Wabash fill (section 79) must be disallowed.

Seventh. That the claim based on the refusal of the defendants' engineers to allow the use of certain graders and wheelbarrows could not be sustained.

Eighth. That the claim for widening the berms on the sides of the roadbed should be disallowed.

Ninth. That the claim for extra pay for diversion channels to drain the track must be denied.

Tenth. That the damages claimed for failure to provide the right of way must be disallowed.

Eleventh. That the claim for loose rock allowance in borrow pits should be disallowed.

Twelfth. The claim for shrinkage should be disallowed.

The referee on the other hand found in favor of plaintiffs against defendants:

1st. An additional allowance for extra work on section 109, $1,552.

2d.   Additional for clearing and grubbing, $401.70.

3d.   Additional for loose rock excavation, $307.15.

4th.   Additional for loose rock excavation, division 2, $5,492.76.

5th.   Additional for loose rock excavation, division 3, $44,857.65.

6th.   Additional for haul, $2,031.93.

In due time each party filed exceptions to the findings which were adverse to them and the circuit court overruled all of plaintiffs' exceptions and sustained fifteen of defendants' exceptions and overruled eight.

Immediately after the decision of the circuit court on the respective exceptions of plaintiffs and defendants, the defendants presented to the court an offer on the part of defendants to confess judgment for $36,785.92, with interest from April 14, 1893, which had not been accepted by plaintiffs. Service of this offer had been made on plaintiffs on the 21st day of September, 1893. Counsel for defendants thereupon moved the court to tax plaintiffs all costs incurred by defendants since September 21, 1893. The circuit court sustained this motion, and entered judgment as confessed, and in addition awarded a lien on the railroad and taxed plaintiffs with all costs except such as had accrued in filing the lien.

## II.

It is conceived that time will be saved in the discussion of the questions in this record by first eliminating some of vital importance at this time.

As already said the referee found against the plaintiffs on twelve of their exceptions. Some of these findings are of the gravest importance and affect more or less every allegation of the petition.

This court on the former appeal held that the stipulation in the contract that "the work shall be executed under the direction and supervision of the chief engineer of said railway

and his assistants, by whose measurements and calculations the quantities and amounts of the several kinds of work performed under this contract shall be determined, and whose determination shall be conclusive upon the parties, and said chief engineer shall decide every question which can or may arise between the parties relative to the execution thereof, and his decision shall be binding and final upon both parties," was a valid and binding agreement, and sanctioned by the highest courts of England, and of the different States of the United States and by the Federal courts, and further held that in the absence of fraud, or such gross mistake, as would necessarily imply bad faith, the classification and estimates of the chief engineer and his assistants would be conclusive upon both parties. We still adhere to that declaration, being convinced upon further reflection that it is sound and just. The referee and the circuit court both accepted this ruling as their guide on the second trial, and the referee finds and the circuit court approves the finding that the charge of fraud and collusion upon the part of the engineers in making their monthly and final estimates is not sustained.

We might content ourselves with this ruling upon a question of fact, because the rule of appellate practice is well settled that when a question of fact has been determined by a jury or referee and that finding has met the approbation of the trial court, the appellate court will only look to the evidence to ascertain if there is any substantial evidence to sustain the finding, but in the investigation we have been required to make in this record we are also firmly convinced that the finding is overwhelmingly supported by the proofs.

On the former appeal it was strenuously insisted by the learned counsel for plaintiffs, that the condition precedent of an estimate by the engineer was no bar to plaintiffs' action, because that estimate had been fraudulently withheld to deprive them of their lien, and that in such case redress would not be denied them.

We held then that where parties agree to abide by the decision or opinion of an architect, engineer or commission of any kind, in regard to the correspondence of the work done with the contract, in an action on such contract, the approval of the person selected by both parties to determine this must be averred and proved, but that if the engineer or arbitrator so chosen made no measurement or estimate, or fraudulently neglected and refused to do so, then plaintiffs would not be debarred of redress upon proper and appropriate charges of such fraudulent and collusive refusal, or failure, to make such estimate. [Dinsmore v. Livingston Co., 60 Mo. 241; Railroad v. March, 114 U. S. 549; Neenan v. Donoghue, 50 Mo. 495.] Plaintiffs amended their petition so as to charge such fraudulent and collusive failure on the part of the engineers of defendant.

On this trial the referee finds and the circuit court sustains his finding that the engineer and his assistants each month during the progress of the work made classification of the materials and estimates of the amount of the work done by plaintiffs, and their subcontractors, and at the close of all the work, made a final estimate reviewing all the work and certified to it in writing, so that this charge also was unsupported by the evidence. This finding of the referee and the circuit court is fully sustained by the written estimates themselves in evidence and the letters and communications of plaintiffs themselves acknowledging their receipt and complaining of the classification and that these estimates were too small. Upon a review of the evidence on this specification we have no hesitation in affirming this finding also. These two findings eliminate the question of fraud and collusion from the case, and greatly simplify further investigation and discussion.

The findings and reasoning of the referee on the 5th, 6th, 7th, 8th, 9th, 10th, 11th and 12th propositions advanced by plaintiffs are so clearly just and his disposition of those claims so admirably supported by the contract and the evidence that

we can do no better than adopt them as our own views of the law and the conclusions which we also have reached from an examination of the record.

Those findings are as follows:

## III.

### "CHANGE OF LINE.

"This item in plaintiffs' account reads as follows: 'Extra work caused by change of line, sections 75 to 78, inclusive, changed by defendant, its officers, agents and employees, causing change in character of material and height of bank, $3,000.'

"It appears and I find from the evidence that at the time of the letting out of the contracts for the building of this railroad, including the forty sections thereof awarded to plaintiffs, profiles were submitted to all the bidders, showing location, proximate quantities, and like information.

"Before any considerable work had been done by the plaintiffs a change of location of a portion of the road was determined upon, in order that the line might be carried nearer to the town of Carrollton. This change affected the eleven western sections of plaintiff's work, viz., sections 75 to 85 inclusive, the point of widest divergence between the old and new lines being at the crossing of Grand river, where they were about three miles apart. On the old line plaintiffs' work crossed Grand river, section 75 extending some three miles to the west of the crossing of that stream; on the new line section 75 fell immediately east of the stream which therefore marked the western end of plaintiffs' work. The general character of plaintiffs' work was substantially the same over both lines except that on account of terminating at Grand river instead of reaching into the hills beyond, the line as changed embraced about a mile more of low land and about the same distance less of hill land. The evidence is conflicting as to whether the change was a real disadvantage to plain-

tiffs, but the view I take of the question renders this inquiry unimportant.

"The contract contains the following provisions: 'No extra charges will be claimed or allowed on account of any changes, either in the line or grade of the road, the prices herein mentioned being considered as full compensation for the various kinds of work herein agreed to be performed......But nothing shall be deemed extra work that can be measured or estimated under the provisions of this contract.'

"I find no evidence that this change of line was made by the engineers or other officers or agents of the railway company either capriciously, fraudulently, or for the purpose of causing the plaintiffs to lose money and profits in the performance of their contract. On the contrary, I find that the change was made in good faith and for a lawful and fair purpose. I am of the opinion and so find that the change was not an unreasonable one, and that it was one which might be fairly said to be within the contemplation of the parties in framing the above quoted provisions of the contract.

"I am further of the opinion that this claim can not be upheld as extra work under the provisions of the contract. All the work actually done by them on either line was capable of being measured and estimated under the contract. This item is more in the nature of damages for a supposed loss of profits, and in my judgment is of such a character that no lien is provided by law for its security, even if fully sustained by the proof. I find no misconstruction of the contract in this respect by the engineers.

"My findings and conclusions therefore on all the evidence is, that this claim must be disallowed.

## IV.

### "WABASH FILL.

"This item is entered in plaintiffs' account as follows: 'Extra work caused by change of grade section 79, changed

by defendant, its officers, agents and employees, thereby increasing heights of bank and length of haul, $8,837.91,' and is besides covered by the following allegations, viz.: 'Said engineers and other officers and agents of said defendants arbitrarily, capriciously, unnecessarily and fraudulently and for the purpose of lessening the profits of said plaintiffs in the performance of said work during the progress thereof, changed the grade of section 79, thereby causing extra work and expenditures to plaintiffs in doing said work on account of change of material and height of bank and length of haul, to the extent of $6,837.91, and at the same time did only allow and estimate to plaintiffs for haul on straight lines instead of the actual routes necessarily taken in making said haul.'

"The claim is founded on a change of grade in said section where the road crosses the Wabash railroad, whereby the level crossing as shown on the profiles submitted to the contractors at the time the work was let, was changed to an overhead crossing. This involved the throwing up of two embankments or approaches to the crossing, each twenty-five feet high at the bridge opening, and thence gradually receding along the line in each direction till the regular grade was again reached; the profile showed the grade at this point to be four feet above the natural surface of the ground.

"I find from the evidence that the first information plaintiffs had of the change of grade from a level to an overhead crossing came to them through a sub-contractor to whom they let a number of sections including this one. Work was commenced here in the month of June, 1887. In the following month the sub-contractor protested to plaintiffs that this work was not contemplated in his contract, and about the last of the same month the plaintiffs made a similar protest to the chief engineer, who, while insisting that, under the contract, the railroad company had the right to change the grade in such case, yet admitted that some additional compensation would be proper, and promised to look into the matter.

"The cost of the work based upon the sub-contractor's force account, I find to have been largely in excess of the estimates and allowances returned by the engineers therefor. But I do not find from the evidence any promise that the plaintiffs should be compensated on that basis.

"In the month of August, the chief engineer went over the work personally and gave his subordinates certain directions to be followed in estimating the work at this Wabash crossing, and by means of which the total allowance made to plaintiffs over and above what would otherwise have been estimated to them for this work, amounted to some $1,800. These increased allowances went into plaintiffs' monthly estimates and finally into the final estimate. As hereinbefore stated the final estimate in this section was held up by the chief engineer in order to recalculate the entire work and ascertain if his directions had been followed out by his subordinates and to determine whether, if followed out, they had resulted in the intended increased allowance to plaintiffs.

"This was a particularly hard piece of work and there is no doubt its performance resulted in a considerable loss to plaintiffs; but I am of the opinion that the court is powerless to relieve them under the evidence in the cause. An increase of grade was expressly provided for in the contract. I can not say that such increase at this point was an unreasonable one. There is no evidence to justify the conclusion that it was made arbitrarily, fraudulently or for the purpose of lessening plaintiffs' profits in the performance of their work. The evidence shows, and I so find the fact to be, that it was made in pursuance of a general policy adopted by the railway company over the entire line then building to cross other railroads above or beneath grade in order to avoid delays and reduce dangers in operating their trains.

"But granting that this particular increase in height of grade was not contemplated at the time the contract was entered into, and that the plaintiffs, under a fair interpretation

of the contract, were entitled to have the measure of compensation increased for this work, still I am clearly of opinion that the amount of such increase was, under the contract, to be determined by the engineers, and that plaintiffs are bound by the prices so fixed and estimated by them: 'For the purpose of avoiding all causes of difference or dispute between the parties to this contract relative to its true intent and meaning; and for the purpose of adjusting in an amicable manner any difference that may or can arise relative thereto, it is hereby mutually understood and agreed by the parties as follows, to wit:

" '1st. No extra charges will be claimed or allowed on account of changes, either in the line or grade of the road, the prices herein mentioned being considered as full compensation for the various kinds of work herein agreed to be performed.

" '2d. Whenever work is required to be done which is not now contemplated or covered by the prices herein mentioned, the engineer shall fix such prices for the work as he shall consider just and equitable, and the said parties shall abide by such prices; provided the party of the first part enter upon and commence such work with full knowledge of the prices so fixed by the engineer; but if the party of the first part decline executing said work at the price fixed by the engineer, the party of the second part may enter into contract with any other person or persons for its execution, the same as if this contract never existed; and if extra work or works not provided for in this contract is performed by the contractors, without protest or notice in writing to the engineer and to the party of the second part before prices shall have been fixed to such work, then the engineer shall estimate the same at such prices as he shall deem just and reasonable, and his decision shall be final, and the party of the first part shall accept of said prices in full satisfaction of all demands against the party of the second part for said extra work. But nothing

Williams v. Santa Fe R'y Co.

shall be deemed extra work that can be measured or estimated under the provisions of this contract.'

"If it be conceded that this work was not contemplated by the contract at the time it was entered into and that plaintiffs were entitled to an additional compensation for its performance, I am of the opinion that the duty of estimating the additional compensation was within the province of the engineer. That he acted in good faith in making this estimate the evidence satisfies me, and I so find, although the evidence is conflicting as to the reasonableness of the compensation allowed. I am of opinion that the honest judgment of the engineer, after repeated examination of the question, is controlling and binding. That if he in fact erred, the error was one of judgment from which plaintiffs can not be relieved in this proceeding. I am therefore, under all the evidence, of opinion and so find that plaintiffs are not entitled to recover upon this item.

## V.

### "REFUSAL TO ALLOW THE USE OF GRADERS AND WHEELBARROWS.

"This item is entered upon plaintiffs account as follows: 'Extra work on sections 80 to 90 inclusive, caused by the use of scrapers as required by defendant, its officers and agents, instead of graders and wheelbarrows, the usual implements used in such work, $7,500.'

"The specific allegation in the petition is as follows: 'Said engineers and other officers and agents of said defendants, arbitrarily, unnecessarily, capriciously and fraudulently during the progress of the work, and for the purpose of lessening the profits of plaintiffs in the performance thereof, required and compelled the plaintiffs to use scrapers in said work instead of graders and wheelbarrows, the usual implements

of said work, and the implements contemplated when said contract was made, thereby causing an excess of expenditure and extra work to plaintiffs of $7,500, for which said officers, engineers and agents fraudulently refused any allowance or compensation.'

"I find from the evidence that one of plaintiffs' subcontractors commenced the use of an implement called the New Era Grader, on a portion of the work. Its use being forbidden by the engineers, they afterwards were using wheelbarrows which after a time were also forbidden. I find that these implements are usually prescribed in railroad construction, except on hill sides or in wet or marshy places, where teams can not be handled to advantage. That embankments constructed with these implements are much less compact and subject to a largely increased percentage of shrinkage. I find that the question of the necessity for their use was passed upon by the engineers and that they determined that no necessity for their use existed when and where they were forbidden. On the evidence I find that their use at the places they were forbidden would have been an unusual mode of railway construction at the time. I am of opinion that the question was one properly referable to the engineers under the contract and that their decision is binding and final in the absence of fraud or such gross error as to raise the necessary implication of bad faith.

"On the evidence I find the existence of neither. Nor do I find that in such decision they acted arbitrarily, capriciously or for the purpose of lessening plaintiffs' profits.

"Again, I am of opinion and so find that this claim, even if supported by satisfactory evidence, is not of such a character as to fall under the designation of 'extra work' as that term is used in the contract; nor is the claim one for labor or material entering into the construction of the railroad, such as is contemplated by the statutes providing for a lien, upon which this proceeding is founded. Under all the evidence, I

am clearly of opinion and so find and conclude, that this item should not be allowed.

## VI.

### "WIDENING OF BERMS.

"This item is charged in the account as follows: 'Extra work caused by widening of berms of sections 80 to 113 inclusive, changed by defendant, its officers, agents and employees, thereby increasing distance of moving borrowed earth, $4,500.' The corresponding allegation in the petition is as follows: 'Said engineers and other officers and agents of said defendants, arbitrarily, capriciously, unnecessarily and fraudulently during the progress of said work and for the purpose of lessening the profits of said plaintiffs in the performance thereof, widened the berms of sections 80 to 113 inclusive, thereby increasing the distance of moving borrowed earth, and causing plaintiffs an excess of expenditure in doing the work to the amount of $4,500, for which said engineers, officers and agents fraudulently refused to make an allowance to plaintiffs, and fraudulently refused to allow plaintiffs for same except upon straight lines and not as the terms and spirit of said contract required by the necessary route traversed in moving said borrowed earth.'

"The item rests upon the allegation of a general, unusual and unnecessary widening of the berms, that is, the space of undisturbed earth left between the foot of the embankments and the borrow pits, to avoid having the embankments when washed down the slope, fall over into the borrow pits; and to prevent the cutting away of the embankments by the action of running water on the sides of the road. The item appertains only to embankments made of borrowed material. The additional cost to plaintiffs, resulting from such widening of the berms, arose wholly from the addition thus made to the haul of material from the borrow pits to the embankment.

"In the specifications annexed to the contract it is provided in respect of this subject as follows: 'When the bank is three feet or less in height a berm of six feet shall be left; between three feet and ten feet a berm of eight feet shall be left; and for banks ten feet or higher a berm of ten feet shall be left. In all cases borrow pits with the berms given above, shall not have on the sides towards the roadbed a less slope than the embankment. When necessary, in the judgment of the engineers, all earth shall be borrowed on one side of the roadbed or the width of the berm increased.'

"I find from the evidence that the berms on the greater part of the work in the sections named were increased above the width designated in the specification; the increase ranging from 2 feet to as high as 19 feet, and that this increase entailed a considerable additional cost in construction. The material however in all cases was removed from borrow pits within the limit of one hundred feet from the slope stakes, and under the terms of the contract where this is the case no charge is allowable for haul. I also find from the evidence that the increase of berms was ordered in all cases by the engineers upon what in their judgment, rendered such increase necessary. I find no satisfactory evidence of fraud in making the order or any purpose of lessening the profits of plaintiffs in their work. And while this required increase of berms was more sweeping and covered more of plaintiffs' work than another person than the engineers might have adjudged necessary, it was the judgment of the engineers and not that of any other that the contract and specifications called for. I am not, on the evidence, able to say that they failed to exercise this judgment honestly, if they actually erred in determining the existence of a necessity for the increase required, as to which the evidence is conflicting. I am of opinion and so find that the error was one of judgment only, and could not be corrected in this proceeding even if the evidence satisfied me that the error in fact existed.

"My conclusion is that the claim should not be allowed.'

## VII.

### "DIVERSION CHANNELS.

" 'Extra work caused by cutting channels through ridges, done at the instance of the defendants, its officers and agents, thereby increasing length of haul, changing of material and increasing expense of plowing and scraping, $4,000.' The specific declaration is as follows: 'Said engineers arbitrarily, capriciously, unnecessarily and fraudulently, and for the purpose of lessening the profits of the plaintiff, during the progress of said work ordered and caused channels to be cut through ridges of same, thereby increasing length of haul, change of material and increasing to plaintiffs the expense of plowing and scraping, and at the same time fraudulently refused to allow plaintiffs anything but straight lines for such haul, and not as plaintiffs were rightfully entitled by actual and necessary route traversed in making said haul, thereby increasing plaintiffs' expenditure as to said item the sum of $4,000.'

"The complaint here is that on various places on plaintiffs' work, the contractors were required to cut channels parallel with the road, in order to conduct the drainage from two or more draws across the intervening ridges into openings through the embankment. These diversion channels varied in depth according to the different heights of the ridges pierced from a slight depth up to 20 or 30 feet. The work of excavating these ditches was estimated to them simply as 'embankment borrowed,' 'excavation wasted' or 'excavation hauled,' according to the location of the ditches and the disposition made of the material. They were usually staked out and excavated to a slope of one foot horizontal, to one vertical, and were six feet wide at the bottom. Plaintiffs claim additional compensation for this work by reason of the additional inconvenience and cost of loosening the material—especially near the

bottom, where the ditches became too narrow for convenient plowing; and by reason of the increased expense of removing the materials up and out of the ditches into the embankment or into spoil banks.    I find from the evidence that the increased cost thus imposed upon the plaintiffs was considerable, and that the compensation allowed for this work, considered alone, was often less than the actual expense of execution, so that actual loss was entailed upon them, notwithstanding that in a number of cases it appears that haul on the material taken out was allowed them within the free haul limits as defined in the contract.

"Yet nevertheless I am of opinion that the claim can not be allowed.    Clearly the work was such as could be measured and estimated under the provision of the contract, and therefore by its express terms should not be deemed extra work. But it is strongly insisted by plaintiffs that these diversion ditches were not the ditches to which reference is made in the contract and therefore this work was not contemplated by the parties at the time of entering into the contract.    I am not of that opinion.    But even if this be conceded, it was performed by the contractors without that protest or claim for extra compensation which the contract required should be made before the prices therefor were fixed by the engineers; in such cases the prices fixed upon by the engineers must by term of the contract be accepted by the plaintiffs, in full compensation therefor.

"The evidence does not satisfy me that the engineers acted capriciously or fraudulently or with any purpose of lessening plaintiffs' profits, in determining either the necessity of channels or the compensation allowed plaintiffs for making them.

"On all the evidence, after a careful consideration of the subject, I am satisfied that the issues on this claim must be determined against the plaintiff.

## VIII.

### "EXTRA WORK CAUSED BY RIGHT OF WAY AND STAKES NOT BEING SUPPLIED WHEN NEEDED, AS REQUIRED BY THE CONTRACT, $10,000.

"This claim was not insisted on by plaintiffs' counsel at the argument and, as I understand, was virtually abandoned except in so far as the evidence directed to this subject might be considered under the general question of alleged oppressive and vexatious action of the engineers, and hardships to which plaintiffs were subjected. At all events it is sufficient to say that in my opinion the claim is a non-lienable one in the nature of damages for which no recovery could be had in this action, and that it is not supported by a fair preponderance of the evidence in the cause."

## IX.

The next finding of the referee which we must consider is one in favor of plaintiffs for $401.70 for "close chopping" 13.39 acres. This finding of the referee the circuit court rejected, and of this action of the court plaintiffs complain. The amount is small in comparison to other claims, but a proper solution of the matter is attended with much difficulty. In this conflict between the circuit court and the referee the question arises in whose favor is the presumption of correct decision?

In Wentzville Tobacco Co. v. Walker, 123 Mo. 662, it was held that the presumption in this court was in favor of the judicial action of the circuit court whose duty and prerogative it was, in a case like this, to examine the report of the referee in the light of the evidence and affirm or reverse his action. That decision we think is in harmony with our practice in reviewing the granting or refusing of new trials. The presumption is in favor of the action of the trial court and it is only

when we find that it has abused its discretion do we interfere
with its judgment.

With this rule of procedure in view let use see what was
involved in this finding. Plaintiffs in their petition claim
238.6 acres of clearing at $30 per acre, and 105.34 acres of
grubbing at $130 per acre. There was no specific allegation
of services for "close chopping" in the petition. The contract
provided the following specifications:

"15. CLEARING. The right of the way will be cleared
for at least fifty feet on each side of the center line, or if the
engineer in charge directs, to full width of right of way. The
valuable timber on the right of way is the property of the rail-
road company or the landowner and must be cut into cord-
wood, if required by the railroad company, for which the
proper charge will be made. All remaining trees, brush,
logs, or other perishable materials will be either removed
from the right of the way or burned, as the engineer in charge
may direct.

"16. GRUBBING. All roots, grubs and stumps must be
removed within the limits of the slope stakes and within six
feet of such slope stakes and under embankments two feet or
less in height. Under all other embankments and for the
same distance from slope stakes all stumps, brush and grubs
must be cut off even with the surface of the ground. Measure-
ments for grubbing will include all areas under embankments
and within six feet of slope stakes; also all areas within slope
stakes of excavations and within areas of all necessary borrow-
pits where grubbing is necessarily done."

On the matter of clearing there is no dispute. In the
matter of grubbing there is a difference of 21.01 acres; plain-
tiffs claiming 105.34 acres at $130 per acre, while the amount
allowed them in the final estimate was 86.58 acres. Plaintiffs'
claim for these 21.01 acres of grubbing is not in fact for
grubbing, but for "close chopping," and arises under this clause
of the specifications: "Under all other embankments and for

the same distance from slope stakes, all stumps, brush and grubs must be cut even with the surface of the ground."

Plaintiffs and defendants both concede as did the engineers, that the contract fixed no price for "close chopping." Plaintiffs contend that inasmuch as the contract fixed no price for close cutting or chopping and that the specifications about close chopping under the grubbing specification provided for its measurements, the same as grubbing proper, it was to be paid for as grubbing. The referee rejected this claim of the plaintiffs, and held that as no price was fixed, the engineer should decide the compensation for close chopping, and approved the price so fixed by the engineer at $60 per acre, or double the clearing price. He also rejected the plaintiffs' claim that they should be allowed grubbing prices for "all areas under embankments and within six feet of slope stakes," but held they should be allowed grubbing only "where grubbing was necessarily done."

The referee finds that the chief engineer instructed his subordinates to allow the additional clearing price of $30 per acre for all "close chopping" already done and ordered its discontinuance. Under these orders plaintiffs were allowed for close chopping, but in the opinion of the referee the engineers failed to allow them for 13.39 acres so chopped. The circuit court disapproved this finding of the referee and found for the defendants on this item. Ought the circuit court to be reversed on this item?

In the first place it will be recalled that the petition nowhere counts on a claim for "close chopping" as such. The action is for clearing and grubbing. On the matter of clearing there is and was no dispute whatever. Neither can it be said there is any difference between them as to actual grubbing. The grubbing was measured and paid for at $130 per acre. The referee has found this "close chopping" was neither ordinary clearing under the contract, nor actual grubbing,

and consequently it fell within the duty and province of the engineer to fix the price as extra work and measure the amount of it. This the engineers have done, and the referee has expressly found there was no fraud or collusion in their said action. There is here no misconstruction of the contract. At most it can only be held to have been an error in the estimates. What then becomes of the rule that in the absence of fraud or collusion the engineers' estimates shall be final.

It would seem the stipulation would amount to little if it is to be overturned by general estimates made after the work is completed and the areas covered with fills and embankments. When we consider that plaintiffs in their demand of December 24th, 1887, for increased estimates, made no such claim as this, that they have not sued for any "close chopping" as such, and that the chief engineer directed the double allowance for all "close chopping" while the work was progressing and such an allowance was then made by the field engineers and paid for, we do not think there is sufficient either in the pleadings or evidence to overcome the estimates made and returned by the engineers, and we accordingly affirm the action of the circuit court on this item.

## X.

The next finding of the referee to be considered is that in which he increases the engineers' estimates for loose rock excavation on division 2 to the amount of $5,492.76.

We consider this separately because while the question of "hardpan" is involved, and made the basis of this additional allowance, we conceive this item can and should be disposed of on another ground irrespective of any supposed or actual misconstruction of the contract as to the classification of hardpan. As already stated the line of railroad to be constructed from Kansas City to Chicago was divided into divisions of about twenty miles each. The plaintiffs' contract covered divisions numbered 2 and 3, and embraced sections 75

to 114 inclusive.   The west end of division 2 was coterminous with the west end of section 75, and both rested on the east bank of Grand river in Carroll county, Missouri.   Division 2 extended to and included section 94.   Division 3 began with the west end of section 95, and included section 114 and all intermediate sections.   Says the referee:

"First, Loose Rock in Cuts.

"Plaintiffs' loose rock classification and allowances having been made on a theory not warranted in the contract, and which resulted in their injury, I am of opinion that they are not bound by the final estimates of the engineers as to the quantities of this classified material found.   Accordingly, I have gone over the entire work, section by section, and cut by cut, as the work has been reviewed in testimony, in an effort to correct all such errors in loose rock classification, as the evidence satisfies me occurred.

"In view of the foregoing, and upon the evidence, I find in the following named cuts the plaintiffs are entitled to have their final estimates increased by the number of yards of loose rock indicated.   In all cuts not named I leave the final estimates undisturbed, not being satisfied from the evidence that the classification made was too small:

### "Division No. Two.

| Section. | Stations. | No. of cubic yds loose rock. Final estimate | No. yards found by referee. | No cubic yards loose rock, to be added final estimate. |
|---|---|---|---|---|
| 91 | 4781–4794 | 540.9 | 1463 | 922.1 |
| 92 | 4794–4802 | 607.7 | 1435 | 827.3 |
|    | 4813–4821 | 173.6 | 1475 | 1299.4 |
|    | 4844–4847 | 238.3 | 587 | 348.7 |
|    | 4847–4855 | 1156.2 | 2758 | 1605.8 |
| 93 | 4875–4885 | 497.6 | 1325 | 827.6 |
|    | 4888–4894 | 584.2 | 1314 | 729.8 |
|    | 4904–4920 | 2200.5 | 8399 | 6198.5 |
| 94 | 4934–4947 | 322.2 | 1647 | 11325.8 |
| Total............................................. | | | | 14084.0 |

"Which at 39 cents a cubic yard amounts to $5,492.76, which should be added to final estimates."

It may be remarked here that prior to commencing work under this contract plaintiffs sublet twenty miles on division 2, sections 75 to 94 inclusive, to Elliott Huss & Company, who did the work on this division. The work of grading, commenced in the spring of 1887, on or about the first day of March. The first voucher is for grading performed on section 75 during March. Monthly estimates followed after date.

The question of classification arose early in the prosecution of the work. Plaintiffs as early as May complained that they were not getting a proper classification of loose rock. Conferences were had and correspondence followed. In certain cuts and on certain sections plaintiffs insisted on a larger allowance of loose rock, and their correspondence shows that they proposed a certain plow test to determine the classification and that they complained of the system of percentage which the engineers used, but much if not all of that controversy is foreign to the particular item now under review.

During this correspondence Mr. B. F. Booker, the chief engineer, replying to a letter of plaintiffs of date July 11th, 1887, on the 12th of July, wrote them as follows: "As to the matter of small monthly estimates, division engineers have been instructed to estimate liberally during the progress of the work, and I can see no reason why they should do otherwise. . . . . . I wish to say also that this is the first that I had heard of any complaint as regards the work on division 2. In fact you have not mentioned any work on this division in the copy of your letter to Mr. Fulton."

On the 16th day of July, 1887, the plaintiffs acknowledged the receipt of Mr. Booker's letter of the 12th of July, and say: "Dear Sir: Your favor of the 12th inst. is at hand. We do not mean for you to understand us as complaining with regard to classification on division No. 2. We only spoke of divisions 2 and 3 with the purpose of identifying our con-

tract in a general way, expecting the specific cases to indicate in detail the object of our complaint."

As a result of this correspondence three of the plaintiffs, Messrs. Benezette Williams, Edgar Williams and Mr. John Nichol met Mr. Booker, the chief engineer, Mr. Fulton, the resident engineer, and LeProhon, a division engineer, at Bucklin, Missouri, July 23d, 1887, for the purpose of a personal inspection of the work and considering the classification of material. They met in Mr. Fulton's office. The question of classification came up, Mr. Booker, the chief engineer, inquired of Mr. Benezette Williams if he had any complaint to make of the classification west of Bucklin, and he said "nothing to complain of there." Bucklin is the station on the line at which the Hannibal & St. Joseph Railroad intersects the Santa Fe, and to better keep in mind its relative position to plaintiffs' contract, it is about the east end of section 103. It will be observed that at this date the principal cuts on division 2 were already opened, and some of them nearing completion. The chief engineer, to whose arbitrament classification of material and measurement of excavation were committed by the contract, was on the ground to examine, hear complaints and suggestions, and plaintiffs notified him then and there they had no complaints to make of classification west of Bucklin and it is unnecessary to repeat that sections 91-92-93 and 94 for which this allowance by the referee is made were west of Bucklin.

But this is not all. After the work was all substantially finished plaintiffs at the invitation of Mr. Robinson, the chief engineer over all, submitted a carefully prepared written statement of their grievances, dated December 24th, 1887. In that letter and statement, after calling attention to an accompanying document pointing out the sections by number and the amount of loose rock that was not measured, they say, "We have not included sections 91 to 99 inclusive, for which the classifications is entirely satisfactory." And yet it is upon these identical sections 91 to 94 inclusive, that the classification

of the engineers is now rejected and their estimates for loose rock increased $5492.76. Could parties have presented a stronger case of waiver? Not only had the contract left the classifiaction of this material to the judgment of the engineers, but they had made their estimates on these particular sections, and twice, at least, plaintiffs had expressed their perfect satisfaction therewith in writing, and declined to have the engineer go over them again, saying "they had no complaint there."

Under such circumstances can parties, years after the work is completed and the evidence in a large measure at least destroyed or covered up, be allowed to go back and upon uncertain recollection and new evidence make out new estimates? Surely this method would be utterly subversive of the plain purpose of the contract. Judge REDFIELD, in Herrick v. Railroad, 27 Vt. loc. cit. 692, after agreeing that the engineer's estimates might be impeached where they were shown to be mere approximations, and not measurements as required by the contract, said: "But even with such proof, I should not feel justified in allowing a court of equity to interfere to correct estimates, which at the time were acquiesced in by the contractors. The necessity of having such vast undertakings closed, as the contract specifies and as all reason requires, would induce me not to interfere, unless complaint was made at the time."

Here there is not merely a failure to complain at the time, but the most pronounced satisfaction with the classification is expressed by the plaintiffs.

By this action of plaintiffs the chief engineer was induced to forego an examination of the material in the cuts then opened west of Bucklin. Had plaintiffs not then and there waived all claim to a different classification than that already made by the resident engineers, a further investigation at the time by Mr. Booker would have resulted as it did in other cuts east of Bucklin, in an increase of classification of loose rock, or it might have furnished him the proofs sustaining the classification made by Fulton and Earle and others. Plaintiffs had

been over the ground, were cognizant of all the facts and then waived all objections to the classification made.

The doctrine of waiver is one of the most familiar in the law. BISHOP defines it in this way: "Waiver is where one in possession of any right, whether conferred by law or by contract, and of full knowledge of the material facts, does or forbears the doing of something inconsistent with the existence of the right or of his intention to rely upon it; thereupon he is said to have waived it, and he is precluded from claiming anything by reason of it afterwards." [Bishop, Contracts (1887), sec. 792.]

Tested by this rule plaintiffs clearly and unequivocally waived any increase in classification in the second division, and can not be permitted to cast upon defendants the burden and costs of litigation after refusing to permit the engineers to correct any error they might have made in good faith.

We agree with the learned circuit court that this finding of the referee can not be sustained in view of the unconditional and unqualified waiver of plaintiffs at all times and under all circumstances until the bringing of this action, and this without regard to whether the engineers made a mistake in the classification or not.

## XI.

The next finding of the referee which we are required to review raises the principal question in this case, and calls for the most careful and thoughtful consideration, not alone because of the large amount of money involved, but of the importance of the questions involved, and the great labor and earnest and able arguments adduced on both sides, and the painstaking and exhaustive labors of the learned referee, particularly on this branch of the case.

We refer to the charge in the petition "that the engineers, whose duty it was to classify the material and measure the excavations, fraudulently, capriciously and wrongfully refused to classify shale, soapstone lying in original or stratified position, coarse boulders in gravel, cemented gravel, and hardpan,

or either of them as loose rock unless the same could not be plowed with a straight ten-inch grading plow well handled behind a good six mule or horse team."

From the testimony the referee found that the charge that the engineers fraudulently and capriciously refused to classify hardpan as loose rock, was wholly unsupported. He found, moreover, that plaintiffs did move large quantities of hardpan to which engineers applied the plow or force test alone, and ignored the contract which required hardpan to be classified as loose rock irrespective of the plow or force test. He found, however, that by means of the plow test large quantities of hardpan were classified as loose rock.

When this cause was in this court on the former appeal, we held that the contract had not submitted to the engineer how hardpan was to be classified, but the parties had agreed that hardpan should be classified as loose rock, but it was left to the engineer to say whether a specific excavation was hardpan. If hardpan he was bound to classify it as loose rock. We held, moreover, that the parties had contracted that the engineer and his assistants should measure and calculate the quantities and amounts of the several kinds of materials to be moved and excavated, and the amounts and kinds of work performed under said contract, and his estimates in the absence of fraud were conclusive upon both parties; that such a contract was entirely legitimate, and would be enforced by the courts. The referee accepted these principles as adjudicated and controlling.

The importance of his finding that the engineers acted in perfect good faith and were not guilty of fraud in their classification, and measurements, is apparent. It reduces the present contest to the question whether the engineer misconstrued the contract and exceeded the authority conferred by the contract, and a subordinate but important question of whether the engineer failed to make measurements and in lieu thereof merely made approximations, and thereby deprived plaintiffs of the just fruits of their labors.

On the main proposition, that of the construction of the contract, the referee finds from the evidence that the judgment of the engineers as to whether the material excavated by plaintiffs in various cuts on said railroad was hardpan or not, did not enter into their estimates at all. That in the view they held of the contract the existence of hardpan as a specific material was wholly immaterial. That whether the material claimed by plaintiffs to be hardpan was such or not they construed the contract to require it to be classified and estimated under the plow or force test, and he finds that it was classified and estimated according to the force test.

Lying at the basis of this controversy was the existence or non-existence of hardpan in the cuts which plaintiffs were required to and did excavate in the performance of their contract.

On the former appeal we ventured the assertion that (on the retrial of the cause) "that there will be a great diversity of opinion as to what is hardpan, we think is highly probable, but the parties to this contract assumed that it was well known. It was the province of the engineer to say what was hardpan and how much hardpan there was excavated." What was surmise then is demonstration now.

As to whether plaintiffs encountered hardpan in their excavations as a matter of fact, evidence could scarcely be more contradictory and irreconcilable. Plaintiffs introduced thirty-seven witnesses on this subject alone, and defendants eighty or ninety. Innumerable definitions of hardpan were given. The dictionaries and geologies were called into requisition. Judicial declarations as to the elements and consistency thereof entering into hardpan were not wanting. Not content with calling all the experts and non-experts within the various States of our Union, an expedition was fitted out for the city of Mexico and thither the referee and counsel wended their way in search of more light. The result of all this testimony was a wide diversity of opinion among witnesses equally

respectable and equally credible, so far as we can judge as to whether the material excavated by plaintiffs was hardpan.

It is well nigh impossible to resist the conclusion that this marked difference as to what constitutes hardpan grows out of the fact that the term has been applied to different formations in different localities, and that it has not been used by railroad men and farmers with reference to the same substance. The geologists and the compilers of our best dictionaries are not agreed upon its constituents. That those engaged in agriculture in Missouri have used the word to designate a hard formation under the surface in many counties, and certainly in the counties through which this line was constructed, does not admit of doubt, but that even they had given the constituent elements a careful study or that they always applied it to a substance of the same hardness or compounds can not be maintained from the evidence.

Counsel for plaintiffs strongly criticize the learned circuit court for using the expression "agricultural hardpan," and distinguishing it from the "hardpan" as ordinarily understood among railroad men. Whether there is a well defined difference between the two or not, our own examination of the evidence leads us to adopt the view of Judge THAYER in Lewis v. R'y Co., 49 Fed. Rep. 708, in which he says: "I am far from entertaining the view that all the material found in the cuts, lying underneath the subsoil or even below the ground, was hardpan within the meaning of that term as employed in the specifications: In my judgment the word 'hardpan' as ordinarily understood among railroad contractors, means something more than clay or very hard clay. It is no doubt difficult to give an exact definition of the word because the substance varies somewhat in composition in different localities. Nevertheless, I feel satisfied that there was some material found in the cuts on the Lewis, Wood & Penny work which engineers might fairly have classified as 'loose rock' without regard to the plowing test, because it was hardpan or cemented gravel."

Confronted as we are then, with the want of uniformity

in definitions of the word, and the conflict between the witnesses as to the character of the material encountered the contract itself must first be appealed to for a solution if possible, of this extremely troublesome dispute.

The parties themselves, it would seem, anticipated this identical difficulty, and sought to provide for it.   They say, "And whereas the classification of excavation provided for in the annexed specifications, is of a character that makes it necessary that special attention should be called to it, it is expressly agreed by the parties to this contract that the determination by the measurements and calculations of the said engineer of the respective qualities of such excavation shall be final and conclusive."

Let us if possible so treat this controversy as to first of all eliminate so much thereof as must be regarded as concluded.

We have just ruled that as to the classification of material on those sections with which plaintiffs had expressed themselves as "entirely satisfactory" as late as December 24th, 1887, after the whole of their work was practically completed and at a time when they were preparing a bill of particulars setting forth in detail their grievances, plaintiffs waived any further investigation by the arbitrator to whom they had agreed to submit their differences and having waived it then, they will not be heard to complain at this late day.   In that statement they say "We have not included sections 91 to 99 inclusive for which the classification is entirely satisfactory."

Now in the increase of "loose rock" made by the referee he allows an increase on sections 95 to 99 inclusive with the remainder of division 3, amounting to 24,966 cubic yards at 33 cents per cubic yard.  So much of said increase must for the reasons above given be rejected on this if on no other ground.   To allow plaintiffs the increase on sections 91 to 99, inclusive, or on any portion of the line west of Bucklin, would encourage unfair dealing and enable them to trip back and

place the engineers wholly in the wrong without the slightest opportunity to correct their estimates, and without an intimation of fraud. Such a course is utterly unconscionable in our opinion. So that whether there was hardpan west of the east line of section 99 we will not, in view of plaintiffs' solemn written assurances to the engineer, inquire.

By the terms of the contract both parties, plaintiffs as well as defendant, had bound themselves that the "chief engineer should decide every question which can or may arise between the parties relative to the execution" (of said contract) "and his decision shall be binding and final upon both parties." It having been found that there was no fraud on the engineer's part, one party can not solemnly assure this chosen arbitrator that all is well and then go around him and sue the other party to the contract. This stipulation is binding.

We come now to the finding of the referee that the engineers wholly misconstrued the contract in this, "that the judgment of the engineers upon the question of the existence or non-existence of hardpan did not enter into their estimates at all." In a word he says, "They applied no judgment to the question. They made no decision." They applied only the plow or force test.

This finding must be examined in two aspects. Did they fail to classify the material? If they applied the plow test was not that the concurrent mutual contemporaneous construction of the contract by both parties during the work?

First. Did the engineers fail to classify the material encountered by plaintiffs in the performance of their contract?

On December 4th, 1887, plaintiffs submitted their written claim for increase of estimates which was accompanied by a tabulated statement indorsed "Exhibit A." In this exhibit an increase is asked on sections 106-107-108-109-110-111-112-113 and 114, on loose rock allowed and in sections 85 and 88 for solid rock. Thereupon Mr. Robinson called for the classification that had been made by the engineer in the field, and on December 31, 1887, the following report was made:

"Bucklin, Mo., Dec. 31, 1887.

"CLASSIFICATION OF MATERIAL IN CUTS.

"From stations 5550 to 6019, from sec. 106 to sec. 114, inclusive.

SEC. 106.

Quantities in cuts only.

| "Station to Station. | Earth C. Y. | Loose Rock C. Y. | Solid Rock C. Y. | Remarks. |
|---|---|---|---|---|
| 5553x17 to 5554x20 | 1000 | | | No hard material. |
| 5554x59 to 5555x43 | 64 | | | All surface soil. |
| 5559 to 5560x10 | 290 | | | |
| 5564x7 to 5566x80 | 3284 | | | Material yellow and blue clay, but not hard enough to need eight horses to plow. |
| 5567x10 to 5568x24 | 311 | 90 | | Some boulders and clay, harder in cut, either side. |
| 5568x45 to 5570x26 | 1645 | | | |
| 5572x10 to 5574x50 | 897 | | | |
| 5576x50 to 5578x81 | 2913 | 220 | | Lower 5' mixed with boulders, but the clay not very hard. |
| 5579 to 5583x37 | 6363 | 1794 | | Lower 6' of this cut is hard clay, with some soapstone and boulders. |
| 5586 to 5588x90 | 947 | 2746 | 95 | Thin stratum of limestone, with hard clay underneath. |
| 5589 to 5591 | 101 | 195 | | As the grade drops from Bucklin to the Muscle Fork bottom, the material changes from light yellow clay to a hard blue and gray clay, with soapstone and strata of limestone directly over solid limestone and coal. |
| Total......... | 17815 | 5045 | 95 | |

·SEC. 107.

Quantities in cuts only:

| Station to Station. | Earth C. Y. | Loose Rock C. Y. | Solid Rock C. Y. | Remarks. |
|---|---|---|---|---|
| 5598   7 to 5601x40<br>5605       to 5608x50<br>5614x26 to 5615x20<br>5615x20 to 5621x54 | 700<br>1845<br>153<br>1624 | 1175<br>963<br>122<br>3573 | 923<br>963<br>31<br>1299 | Cuts on this section are in the material overlaying solid soapstone, mixed with layers of limestone and with from 2 to 6 ft of earth on top of them. |
| 5633x94 to 5639x30 | 3412 | 18769 | 11944 | This cut has about 2 feet of earth on top.   Then clay and detached pieces of limestone, then hard clay and limestone 10' thick, then soapstone and 5' of limestone and soapstone underneath. |
| Total......... | 7734 | 24602 | 14598 | |

## Sec. 108.

Quantities in cuts only:

| Station to Station. | Earth C. Y. | Loose Rock C. Y. | Solid Rock C. Y. | Remarks. |
|---|---|---|---|---|
| 5654–60 to 5657–75 |  | 2200 |  | All soapstone. |
| 5661–37 to 5669–70 | 1915 | 8395 | 4418 | This cut, with the exception of 2' of earth on top, is soapstone, with a stratum of limestone, 4.5' thick over it. |
| 5672–50 to 5674–50 | 359 | 294 |  | 2-3 surface soil, balance soapstone. |
| 5681–43 to 5683 | 1084 | 120 |  | 1 1-2' soapstone in bottom, balance yellow clay, plowed with three teams to one plow. |
| 5683    to 5688 | 14729 | 14729 |  | Upper half of this cut yellow clay mixed with sand, lower 4' clear, soft sand, balance is hard joint-clay.  Soapstone disappeared here. |
| 5688    to 5693–59 | 11959 | 14617 |  | Upper 1-2 yellow clay mixed with sand, lower half very hard joint-clay. |
| 5694–63 to 5697 | 1008 | 432 |  | Plowed with three teams; upper 2-3 of this cut not hard; bottom hard gray clay. |
| Total......... | 31054 | 40787 | 4418 |  |

### Sec. 109.

#### Quantities in cuts only.

| Station  to  Station. | Earth C. Y. | Loose Rock C. Y. | Remarks. |
|---|---|---|---|
| 5707        to 5711x14 | 3197 | | Light clay and sand. |
| 5717x18 to 5723x30 | 3224 | 1075 | 3-4 of this cut plowed with three teams to a plow, balance four teams to a plow. |
| 5723x30 to 5729x70 | 5772 | 2843 | Lower quarter of this cut hard clay, balance not hard, plowed with three teams to a plow. |
| 5730        to 5732 | 356 | | |
| 5733x37 to 5735x20 | 1423 | 701 | Only plowed in bottom with four teams to a plow. |
| 5738        to 5740x76 | 2198 | 3298 | Upper 6' easy plowing, balance very hard clay and hard work for four teams to plow. |
| 5746x20 to 5748x56 | 1583 | 1583 | Lower third of this cut very hard plowing. |
| 5750x56 to 5784x82 | 4806 | 4807 | Same as cut just west. |
| Total........ | 22559 | 14307 | |

## SEC. 110.

### Quantities in cuts only.

| Station to Station. | Earth C. Y. | Loose Rock C. Y. | Remarks. |
|---|---|---|---|
| 5760–81 to 5763–95 | 1953 | 1954 | Light yellow clay on upper 1-2; lower 1-2 hard clay. |
| 5758–56 to 5773–54 | 4762 | 8842 | About 5' of soil and light clay on top, balance, very hard gray clay; plowed with five teams to one plow. |
| 5774–18 to 5776–57 | 1841 | 1841 | |
| 5783–14 to 5784–36 | 343 | | |
| 5788–23 to 5792–90 | 4760 | 3895 | Upper 3-4 plowed with three teams, balance hard clay and plowed with four teams to one plow. |
| 5799–80 to 5805 | 3208 | 566 | All soil and light clay, except about one degree in bottom. |
| Total......... | 16867 | 17098 | |

## SEC. 111.

| Station to Station. | Earth. | Loose Rock | Remarks. |
|---|---|---|---|
| 5805       to 5807x85 | 611 | | |
| 5813x37 to 5828x90 | 33545 | 33545 | For 300' in each end of this cut no hard material.   Balance upper half clay and sand.   Lower half very hard clay with some large sand pockets. |
| 5837x 6 to 5839x32 | 847 | 847 | |
| 5840x78 to 5843x20 | 1176 | 579 | |
| 5845x32 to 5846x20 | 43 | | |
| 5850x50 to 5857x10 | 3163 | 12671 | About 3' of earth on top.   Balance very hard clay. |
| Total.  ....... | 47642 | 47642 | |

Williams v. Santa Fe R'y Co.

### Sec. 112.
### Quantities in cuts only.

| Station to Station. | Earth C. Y. | Loose Rock C. Y. | Remarks. |
|---|---|---|---|
| 5866–45 to 5867–85 | 240 | | |
| 5868–52 to 5872– 4 | 3663 | 2197 | Except about 4' in bottom, this cut was plowed with three teams to plow. |
| 5872–34 to 5875–21 | 3390 | 1130 | About the same as previous cut. |
| 5880–80 to 5883–75 | 958 | | |
| 5880–39 to 5889–54 | 3696 | 1232 | About 2' in bottom of this cut was hard plowing with four teams, balance plowed with three teams to one plow. |
| 5890–54 to 5895–42 | 6036 | 2012 | |
| 5906–38 to 5915–80 | 20450 | 24994 | This cut had numerous sand pockets. After removing a depth of 6 or 8' which was easy plowing; half the cut was plowed with two plows, one working three teams, the other four. Next material was very hard, and about 5' in bottom, at center of cut, required five and six teams on each plow. See progress profile. |
| Total........ | 38433 | 31565 | |

### Sec. 112.
### Quantities in cuts only.

| Station to Station. | Cubic yards earth. | Cubic yards loose rock. | Remarks. |
|---|---|---|---|
| 5921x16 to 5924x55 | 2227 | 1198 | Lower 4' of this cut very hard clay. |
| 5925x11 to 5927x56 | 2313 | 1245 | About the same as previous cut. |
| 5956x80 to 5957x79 | 189 | | |
| 5962x12 to 5971 | 15419 | 10279 | |
| Total.... .... | 20148 | 12722 | |

## Sec. 114.

### Quantities in cuts only.

| Station to Station. | Earth C. Y. | Loose Rock C. Y. | Remarks. |
|---|---|---|---|
| 5971      to 5975<br>5977–10 to 5996 | 280<br>39261 | 39261 | 600' in west end and 400' in east end of this cut had no hard material. Elsewhere 6' to 15' on top was easy plowing.  See line on progress profile; that part of cut classified as 75 per cent L. R. contained large sand pockets, and most of the time could have been plowed with three teams instead of four teams to one plow.   That part of cut classified as 100 per cent L. R. was very hard clay and required four or five teams to one plow. |
| 6000–53 to 6008–40 | 12554 | 23312 | The upper 8' of this cut could have been plowed readily with three teams to a plow.  Below that depth material was very hard clay without sand pockets, and required four or five teams to one plow. |
| 6016–88 to 6019 | 2523 | 2523 | |
| Total......... | 54618 | 65096 | |

Coincident in time with this classification by Mr. Booker and his assistants, was the claim of plaintiffs for increase, and it is a most significant fact that in all their specifications for increase on these identical sections the word "hardpan" is not to be found, but throughout numerous references are to the plow test and number of horses used to do the work.   So that it can hardly be said that at that time, at least, defendant's engineers were apprised that plaintiffs would make a claim for specific hardpan.   On the contrary the plaintiffs in describing the material in the said cuts used the words "hard earth," "hard plowing," "hard lumpy material," "clay" and defendant's en-

gineers style it "clay," "blue clay," "soft clay," "yellow clay," "hard clay," "joint clay," and "hard plowing."

But the point is this: Here was a distinct classification of the material by the resident engineers and approved by Mr. Robinson the chief engineer.

It is said, however, by the learned referee that the engineer did not exercise his judgment as to whether this substance was "hardpan." He gave no judgment.

But is it not obvious that when the engineers classified the material as "clay," "yellow clay," "joint clay," "hard clay," and "hard plowing," they thereby found it was not "hardpan?" Surely they were not called upon in each instance to certify affirmatively that it was not hardpan. We are constrained to find with the circuit court, that this material was classified, and that no hardpan in the opinion of the engineers was encountered.

It is true, counsel for plaintiffs bitterly assail this conclusion. But when they are confronted with the question, why did not plaintiffs somewhere in all their written correspondence assert this was hardpan? the answer is, that having in May, 1887, made the claim to Mr. Fulton in a verbal conversation that the specific materials should be classified as loose rock, and having been overruled, nothing was left to plaintiffs but the plow test, and subsequent to that time their whole endeavor was to get a fair construction of the plow test and they did not insist on the hardpan classification further because it would only irritate the engineers. In a matter so vital to plaintiffs, it seems to us this is not satisfactory. The fact is that aside from this one occasion, no pretense is made that hardpan was specifically mentioned and asked to be classed as loose rock irrespective of the plow test. This we gather from Mr. Benezette Williams's testimony. He says: "I made no reference to the specific materials only in some communication to Mr. Fulton and Mr. Booker or in one or two of them; we made reference that these specific materials should be classed

as loose rock; *it was a reference*; it was not put in explicit terms; in our general conversations with them, which were not very frequent after that trip with Mr. Fulton and Mr. Booker over the line, and in our conversations with Mr. Robinson, we based our claim to classification mainly on the plow test, as that was the position they had taken. We wanted to prevent unnecessary disputed points with them." In a word, a reference made not in a direct business way, and to an inferior officer, is made the sole basis of the claim that plaintiffs claimed this material was hardpan and should be so classified and although it amounted to a difference of $50,000 to them, they desist from even mentioning their claim again, although they were invited by the chief engineer to state all their claims in the fullest manner, contrasted with the conduct of plaintiffs in asserting their rights in every other respect as evidenced by their written demands and appeals from Fulton to Booker and from Booker to Robinson, this acquiescence seems to be entirely unnatural. No other right was so abandoned by them, but on several occasions they were renewed after the most explicit rulings against them.

The letter of July 20th does not settle the contention that plaintiffs in that letter made the claim of hardpan. True it is that they say, "The specifications seem very clear in drawing the line between earth and loose rock, and by naming certain kinds of material as loose rock and by further classing as loose rock any material requiring more than six horses to plow. Our understanding being that in any special case where a fairly well defined dividing line can be found between six horses plowing, and that requiring more than six horses, the latter shall be classed as loose rock and that only in cases when it is impossible to determine the dividing line is it permissible to estimate by judgment a certain part as loose rock and another as earth."

Our conclusion is that the engineers did classify this material, and that in our opinion it was not hardpan within

the meaning of the contract, and that their action is not open to the charge of fraud in so doing, and our conclusion is that plaintiffs themselves did not regard this material as hardpan at that time, because their letters and demands are utterly irreconcilable with that claim.

And this brings us logically to the other proposition of defendant, that both sides considered this was proper material for the plow or force test.

It is no longer doubtful that in the construction of a contract even when the language is unambiguous courts will look not merely to the words employed, but the subject-matter and surrounding circumstances, and the contemporaneous construction of the language by the parties themselves.

This court in The St. Louis Gas Light Co. v. St. Louis, 46 Mo. loc. cit. 128, said: "Nor should any regard be paid to loose declarations or equivocal or isolated acts, but the continuous conduct of the parties for a series of years concerning the subject-matter of the contract . . . . . may make their understanding as clear as by the greatest precision of language." And to the same effect will be found Ellis v. Harrison, 104 Mo. 270; Jones v. De Lassus, 84 Mo. 541; Patterson *r*. Camden, 25 Mo. 13; Scott v. Scott, 95 Mo. 318.   This court, in a word, has adopted the aphorism of Lord SUGDEN in Attorney-General ex rel. v. Drummond, 1 Dru. & War., 368, "Tell me what you have done under a deed, and I will tell you what that deed means."

Did, then, both parties agree that a plow test was to be applied to the material now claimed to be hardpan and therefore entitled to specific classification as such?   We have seen that aside from the one or two verbal references to hardpan by plaintiffs to Mr. Fulton in May, 1887, who testified he did not hear them, or does not remember them, the other references to classifying hardpan as loose rock, "were not put in explicit terms" according to Mr. Williams and both sides naturally looked to the written correspondence then had as to their re-

spective claims.   Certainly this court and the circuit court find it much more satisfactory to look to the writings, for as Lord COKE said in the Countess of Rutland's Case, "It would be inconvenient that matters in writing made by advice and on consideration and which finally import the certain truth of the agreement between the parties, should be controlled by an averment of the parties to be proved by the uncertain testimony of slippery memory."

The conversations of Mr. Benezette Williams and Mitchell with Fulton the engineer were in May.   On June 20, 1887, plaintiffs wrote to Mr. Fulton as follows:

"We regret exceedingly to again raise the question of estimates on our contract, having hoped that those for May would be such as to relieve us of so unpleasant a necessity. Such analysis of the May estimates as we have been able to make, however, convinces us that in the matter of classification, at least, there is a material variation between the allowance of loose rock and the amount that we were at that time entitled to under our contract.   A considerable part of this variation is •due, no doubt, to the care properly exercised in rendering partial statements.   But another and perhaps a larger part may be due to the difference between your interpretation of the contract and ours.   In order that you may clearly understand our position we beg to explain it as briefly as the circumstances of the case will allow.   We all agree that the purpose of providing for the classification of material, is, first, to protect the contractor from direct loss growing out of hard material, the existence of which is unknown; second, to save the company from indirect loss by having to pay exorbitant prices because the quality of the material was unknown.

"The specifications seem very clear in drawing the line between earth and loose rock, and by naming certain kinds of materials as loose rock, and by further classing as loose rock any material requiring more than six horses to plow it.   Our understanding being that in any special case where a fairly

well-defined dividing line can be found between six-horse plowing and that requiring more than six horses, the latter shall be classed as loose rock, and that only in cases where it is impossible to determine the dividing line, is it permissible to estimate by judgment, a certain part as loose rock and another part as earth. We believe it is a recognized principle of law that as far as possible the contract should have that construction put upon it which would most facilitate a determination of the scope of each of its provisions. For instance, in the present case, such a construction should be placed upon our contract as will lead most nearly to an exact determination of the different classes of material named; that two equally skilled and honest persons may come as nearly as possible to the same conclusion. If we are right in these conclusions, then we surely have not received the amount of loose rock which our contract entitles us to. If we are wrong; if the loose rock classification is to be applied at the discretion of the engineer to save the contractor from loss so far as he in his judgment may think desirable, then we still have not received the amount which equity would give us.

"In order that the specific case that we had in mind may be understood, we append a statement which will bring to your attention in detail some of the places where our classification is short. In sections 106 and 107, which includes the Muscle Fork cut, the detailed allowance of loose rock amounts to 6,216 cubic yards, which is scarcely one-half of the quantity which approximate estimates convince us we should have had. In the cut between stations 5688 and 5693 plus 50, we understood your classification to be three-eighths of the total work done to June first, loose rock. This according to our estimates, would give us 6,960 cubic yards as against 11,500, which we think we ought to have had. This is a case where it is easy to trace a dividing line between loose rock and earth, and where it can be done, it seems to us the proper way to do. In the large cut, section 11, where our sub-contractors, Ames &

Trickey, are working, we understand your classification to be ten per cent of the work done to June first, on the central seven hundred feet, for loose rock, which would have given 3,000 yards, to which would be added the allowance for other cuts, the amount in section 111, 5,400 cubic yards. The May estimate gives 2,748 cubic yards. We believe you will agree with us that sections 105 to 114 inclusive are unusually and unexpectedly expensive sections, and as these include a large share of our work, it will be readily seen that this work will be made self-sustaining by a classification such as we think the contract warrants. Another month or two with such classifications as we have been having will prove disastrous to our cub-contractors and hence to ourselves.

"We trust you will give this subject some consideration and take such steps as will lead to a settlement which will be fair to both parties to the contract."

This letter was at once referred to Mr. Booker, chief engineer. On July 12, 1887, he wrote plaintiffs as follows:

"Replying to your favor of the 11th inst. will say that I will endeavor to meet you on the work, as requested, some time after the 20th inst., provided I find it possible to do so just at that time.

"As regards the question of interpretation of the clause in the specifications relating to loose rock, I must confess that on my part I fail to see the exact dividing line between earth and loose rock which you maintain is contained therein. This same clause could be made to mean either of the two following extremes:

"First. That the six-mule team plowing was supposed to cover only material in which said plow team could do a full day's work or furnish the customary quota of scraper and wagon teams with work.

"Second. Or it could mean that all material which said six mule team could not even move, or to use a colloquial expres-

sion, "phaze it," was to be classified as loose rock, all the remainder earth.

"Please advise me if it is your intention to maintain that the first extreme given is the one under which you claim your work should be classified. In other words, that by the sole addition of an extra team to your plow you are justified in asking for a classification of material which is paid for at about three times that of the material which does not require such extra team.

"As to the matter of small monthly estimates. Division engineers have been instructed to estimate liberally during the progress of the work, and I can see no reason why they should do otherwise. I wish to say also, that this is the first I have heard of any complaint as regards the work on division 2. In fact, you have not mentioned any work on this division in the copy of your letter to Mr. Fulton.

"I wrote you some days since, asking if you could not increase the force on sections 101 and 103, so as to let us out west of Bucklin with our track laying at as early a date as possible. Please let me hear from you regarding this."

On July 16th the plaintiffs replied as follows to Mr. Booker's letter of the 12th.

"Your favor of the 12th is at hand. We did not mean for you to understand us as complaining with regard to classification of division 2. We only spoke of division 2 and 3 with the purpose of identifying our contract in a general way, expecting the specific cases to indicate in detail the object of our complaint.

"If we understand your petition as stated in your letter and as practiced by the engineers, six-horse plowing can mean either of the following things:

"First.    Only such material as six horses can plow and do a fair day's work.

"Second.    Any material which they can plow in however small an amount.

"Third.   Something intermediate between the two at the option of the engineer.   We hold that the third interpretation is not allowable, for the reasons that it could not be applied in practice by any two men alike.   It would leave a contractor wholly dependent upon the judgment, skill and honesty of the engineer.   In such a case as ours, the engineer could classify so that the contractor would make something or be utterly ruined financially.   We maintain that no interpretation of a contract that places such power in the hands of one party to it can be legally maintained.   The second interpretation can not stand, because it would wholly nullify that clause of the contract, as any material except solid rock can be plowed by six horses to some extent.

"The first interpretation is, to our minds, the only tenable one, because it is the clear and obvious meaning of the language.   Anyone signing such a contract, would, like ourselves, take it to mean just what it says. 'Horse power' in engineering has a definite meaning, so does one man's work and one horse's work.   In like manner, six-horse plowing is what six horses can plow in reasonable quantities with ordinary fatigue.   Any other meaning is a forced one, which had never occurred until Mr. Fulton suggested it.   If it were a fact, as you say, that by the sole addition of an extra team to a plow we would receive about three times the price received for the material which does not require the extra team, we can not see why that should change the contract.   Such a statement is, however, far from describing the facts, which are as follows:

"That we strike material which requires more than six horses indicates that what is clearly earth is difficult to work.   The earth east of Bucklin has averaged hard six-horse work.   If we have used four to a small extent, the advantage thus gained has been more than offset by using six horses where they could not do a sufficient day's work, either because of the hardness of the material, or because many of the cuts were so short that scarcely half a gang of scrapers could be worked

after a plow.    The price that we get for earth is insufficient to do what we freely acknowledge to be earth.    Again, in the hard, lumpy material scrapers can do but little more than half work.    Not only is there a loss in this way, but higher prices must be paid to plow and snatch teams.

"In one particular cut, owing to these causes the material could not be removed by scrapers and plows except at a loss even at loose rock prices, and in another one plowing even with ten horses has had to cease.    As a matter of fact, every yard that we claim as loose rock is needed to compensate for hard earth work on the one hand and hard loose rock on the other.

"Our interpretation of the contract will only give us justice, though we are unable to see why we are not entitled to the advantage if there be any in a proper classification of loose rock as much as we would have been entitled to the advantage of easy earth material if the work had turned out to be such.

"We trust that you will be able to meet us on the work soon after the 20th and before the estimates for this month are made.

"For the good of the work the change in classification should come now.    We think there is a good force at work on 101 and 102.    As to latter section we did not get to work on it until June because of the right of way but we will do all we can to expedite the matter."

From this correspondence gone over again and again we deduce two facts.    The first is that defendant's engineers had in fact classified this material.    They had, at least, not failed to give a judgment.    Their judgment may have been erroneous, but they had given it, and with that classification plaintiffs were dissatisfied.

Second.    In the letter to Mr. Fulton, plaintiffs gave him their construction of the contract.    They were opposed to the percentage method theretofore adopted, and in lieu thereof

they proposed as their understanding of the agreement that "in any special case, when a fairly well defined dividing line can be found between six-horse plowing, and that requiring more than six horses, the latter should be classed as loose rock, and that only in cases where it is impossible to determine the dividing line is it permissible to estimate by judgment a certain part as loose rock and another part as earth."

But, nowhere in that letter can we find any demand that the material now claimed to be hardpan was hardpan, and should be classified as loose rock on that account, without regard to the plow test.

On the contrary the plow test is the one which plaintiffs required as to this material, and the proper method of applying that test is given. One of two conclusions is inevitable. Plaintiffs either did not think of the hardpan stipulation in the contract, or if they did they considered the material they were encountering as other and different material and hence subject only to a proper plow test.

And so they evidently impressed Mr. Fulton, for we find him referring the matter to his superior and saying, "Their (plaintiffs') claim evidently hinges on the idea that whenever six horses can not do a good day's work in plowing any material that material is in consequence all loose rock, which claim it seems to me can scarcely be considered a sound one," but clearly Fulton did not suspect then that plaintiff claimed this material was hardpan or he would have reported it to Booker, his chief, as he seems to have always done. But it will be noted plaintiffs, as was their right, appealed to Mr. Booker and inclosed their letter of the 20th June to Fulton, but still there is no claim that they have encountered hardpan, and the division engineers are misconstruing the contract, and applying the plow or force test, whereas it is their duty to classify it as hardpan, and *ipso facto* loose rock.

Booker responds, and as might be expected, he makes no

mention of hardpan, but devotes himself to plaintiffs' plow test, and repudiates it, and says to plaintiffs, you made no complaint to Fulton of classification in division No. 2. What is your objection to the classification there? Plaintiffs, as we have already seen promptly explained they were not complaining of the classification on division No. 2, but they proceeded to insist that the "six-horse plowing clause" in the contract could only mean "such material as six horses can plow and do a fair day's work." Fulton then understood plaintiffs' contention. All material of whatever kind or character, which six horses could not plow and do a good day's work in, should in plaintiffs' view be classified as loose rock. Whereas, the engineers thought it should be estimated on a percentage basis, and did so classify it. But certainly in this appeal, if plaintiffs were candid men as we think they were, if they regarded this material as specific hardpan, it was their duty then to demand that the chief engineers so classify it as required by the contract.

Thus another most fitting opportunity was given to make this claim of hardpan.

The engineers construed the contract that all the material was reducible to three kinds, earth, loose rock, solid rock. When a full day's work could be done with six horses, the material was classed as earth. When an intermediate material between earth and clear loose rock, the engineers made a percentage estimate, but it is almost incredible that competent educated business men as plaintiffs obviously were and are, would have maintained this controversy about the plow test in all this correspondence if they had seriously thought this material was specific hardpan, for which latter material the contract gave them fifty to fifty-five cents, when they were only getting 16 cents for earth.

We might extend this discussion further, but after the most mature deliberation and laboring under the conviction that plaintiffs had a hard contract, we can not agree with the

Williams v. Santa Fe R'y Co.

learned referee, either that the engineers did not classify the material, or that plaintiffs fairly made a claim during the execution of this work that this material was specific hardpan. On the contrary, we think both parties mutually considered this was an intermediate material when not clearly earth or loose rock, and that the engineers applied the percentage method which we think must be upheld in practical railroading.

We by no means ignore plaintiffs' contention that when they showed that the engineers applied the plow test to all this material it only became necessary to show there was hardpan encountered on the work, and was not estimated as loose rock. But does this make a case?  It having been affirmatively found both by the referee and the circuit court, that there was no fraud on the part of the engineers and it having been further shown that they did classify this work as "clay," "hard clay," etc., and not as hardpan, and the contract having delegated that power to the engineer, is it not incumbent on plaintiffs to go further?  The fact that honest witnesses have deposed that there was hardpan, and equally honest witnesses testified it was not hardpan, can not affect defendant because it had a right to abide by the finding and classification of the engineer to whom both parties had committed that question.

It was to avoid this very conflict of evidence that this stipulation was placed in the contract.

The parties agreed that the engineer and not the conflicting evidence of these witnesses, should do the classifying. He did it after giving plaintiffs a full opportunity to make their claims. He increased their estimates some $5,000. With the highest regard for the learned referee, and conscious of the labor which he expended in reaching his conclusion, we can not concur in his finding and we disallow his finding of $44,857.65 for loose rock in addition to the amount found by the engineer in his final estimate.

## XI.

The referee also found that in one instance only, to wit, in "Sand Rock Cut," in section 85, division No. 2, the engineer did not allow plaintiffs as much solid rock as he should. He says as to this particular material: "The evidence satisfies me and I find the fact to be that it was rock—sand rock—in a solid bed or mass in its original position. That it was softer than rock, ordinarily, is undoubtedly true, but in my opinion this would not exempt it from the higher classification agreed upon, where more of the conditions were lacking. The engineers classified it 75 per cent solid rock, and 25 per cent loose rock......In my opinion this was a misconstruction of the contract." He accordingly allowed plaintiffs $307.15, for the difference between solid and loose rock.

The circuit court set aside this finding of the referee.

The specification in the contract is as follows: "Solid rock shall comprise, first, rock in solid beds or masses in its original or stratified position; second, boulders or detached masses of rock exceeding one cubic yard, and all other material which in the judgment of the engineer can not be removed without blasting."

A careful review of the evidence on this point convinces us that this was a body of compact sand. While in a body it was so friable that the company attempted to use it for ballast, but it soon blew away. But we do not put our decision on that phase of the case. It is not our province to weigh evidence under this contract until we are convinced that the engineers misconstrued the contract or acted fraudulently. In the language of the Supreme Court of Virginia, in Condon v. Railroad, 14 Gratt. loc. cit. 312, "Was it not for the engineer to decide under which of the heads enumerated in the contract the said rock should be classified; and, if of opinion that it could be classified under none of them, what price should be allowed for its excavation? Was not this one of the 'disputes

and difficulties arising under the contract,' which he was expressly authorized to determine, and which it was necessary for him to determine in order to ascertain the amount due on the contract? And can this court, even though it may differ in opinion with him, revise or reverse his decision? If it did differ in opinion with him, it could only say, as did PARKE, B., in Faviell v. Railroad, 2 Welst. Hurl. and Gord. 346, 'It is simply the case of an erroneous decision; and if parties choose to refer a matter to a judge of their own selection, they are bound by his decision both in fact and in law. The fallacy lies in assuming that the arbitrator has exceeded his jurisdiction.' "

The character of this material made it peculiarly proper that an engineer on the ground should classify it. That he made a most liberal allowance for it we think is shown by the evidence. We affirm the circuit court on this item.

## XII.

Again. The referee increased the final estimate on haul to $2,031.93 on sections 85, 91, 107, 113 and 114.

It is utterly impossible to condense the evidence on this point into any reasonable space, appropriate to an opinion. It must suffice to say that the referee bases his finding of a misconstruction of the contract on the assumption that the engineers under "the actual haul" theory improperly excluded the first hundred feet, on the ground that it was a free haul to that extent and in measuring only on straight lines, when the actual route travelled was necessarily circuitous, owing to the lay of the land. Now this whole matter of haul and a claim for additional allowances was submitted to the engineer at the close of the work, in their letters of December 24, 1887, January 26 and 27, 1888. A comparison of the tabulated statement made by the plaintiffs as an exhibit with their letter of January 26, 1887, shows that the chief engineer allowed a net

increase in the final estimate on all the sections of 870,427 cubic yards, and on five sections Nos. 76, 106, 107, 110 and 117, the final estimate exceeds the claim made by plaintiffs in their January letters 81,720 cubic yards or $989.64.

The matter was then finally decided by the chosen arbitrator. No fraud was charged, and an examination of the contemporaneous instructions of the chief engineer to the field engineers who were daily on the line convinces us that they were directed to give actual distances and did measure by the circuitous routes.

Plaintiffs must rely largely upon their engineer Poore and an examination of his evidence and his estimates impress us that it would be very hazardous to attempt to set aside the actual measurements made by the chosen engineers who did their work at the time. If there was any one matter which was properly left to the engineers it was this question of haul. In our opinion an attempt now to undo the work of the engineers and substitute the estimates of any other set of men, whatever their acquirements, would be largely guess work. There being no fraud and no such evidence of gross mistake as would imply bad faith or a failure to exercise honest judgment, the final estimates of the engineer must be held conclusive. [Williams v. Railroad, 112 Mo. 493; Chapman v. Railroad, 114 Mo. 549; Kihlberg v. U. S. 97 U. S. 398; Elliott v. Railroad, 74 Fed. Rep. 707.]

We think the circuit court correctly refused to allow this increase also.

As to the finding of $15.52 for extra work done in January, 1898, the evidence is not satisfactory, but the preponderance we think is in favor of the conclusion that all these matters were paid for and adjusted at the time on the vouchers for extra work, none of which were rejected, or it was work which did not fall under this contract. Certainly we have no such weight of evidence as would justify us in reversing the circuit court's judgment on this question of fact.

When the circuit court passed upon all the exceptions to the referee's report, and made its finding thereon, the counsel for defendants, so the record recites, exhibited to the court the following offer to confess judgment which is in words and figures following:

"OFFER TO LET JUDGMENT GO.

"To the above named plaintiffs:

"Take notice that the above named defendants, the Chicago, Santa Fe and Cal. Railway Co. and Chicago, Santa Fe Ry. Co., of Iowa, offer to permit judgment to go against them on plaintiffs' petition for $36,785.92, the amount defendants all admit to be due and unpaid to plaintiffs on their contract sued upon in this case.

"The above amount, as shown by estimate of April 14, 1893, and an estimate for section 79, and for interest to aforesaid balance at six per cent from said 14th of April, 1893, to 20th day of Sept."

The circuit court thereupon taxed plaintiffs with all costs incurred by defendants after September 21, 1893, and that plaintiffs recover only the costs incurred in and about filing their lien.

Error is assigned on this action of the court, in adjudging the cost against plaintiff.

Evidently the court taxed the cost against plaintiffs on the ground that they had not recovered "a more favorable judgment" than defendants had offered. The offer of defendants was a mere money judgment whereas the court gave plaintiffs judgment enforcing their mechanics' lien. Certainly it can not be said that the lien was a mere incident and necessarily followed the money judgment. It was essential to plaintiffs to recover this lien.

On a former appeal it appeared plaintiffs had been denied their lien and a judgment subject to mortgage liens would

have been of little avail.    If defendants had offered a judgment for the lien also it would have been a much more favorable judgment in our opinion.    We think the court erred in taxing plaintiffs with the costs.

As to interest, we also hold that plaintiffs are entitled to interest on the amount of the final estimate from the commencement of this action on the 13th day of June, 1888, at the rate of 6 per cent per annum.    Plaintiffs having been driven into the courts to establish their lien are entitled to the lawful interest from the date of demand which in this case was the commencement of the action.

The judgment is accordingly reversed with directions to the circuit court to enter judgment for plaintiffs for the amount of the final estimates, to wit, $30,399.06, less $3,857.99, advanced by defendants, or $26,541.07, with interest thereon at the rate of six per cent per annum from June 13th, 1888, until paid, and for the costs of the suit, and decree plaintiffs their mechanics' lien on the said railroad as prayed in the petition.

*Burgess, J.*, concurs; *Sherwood, J.*, absent.